Stephen BROSIOUS, et al., Plaintiffs,

v.

CHILDREN'S PLACE RETAIL STORES, et al., Defendants.

No. Civ.A. 97–5021(JC).

United States District Court,
D. New Jersey.

Aug. 23, 1999.

Allyn Zissel Lite, Lite, DePalma, green-berg & Rivas, LLC, Newark, NJ, for Stephen Brosious, Rudy Pallastrone, Morris Rubin, Todd B. Katz, Melvyn Rosenberg, Deane W. Creighton, David J. Steinberg, Chaile B. Steinberg, Paul Sacco and Richard W. Virtue.

Allen J. Barkin, Schwartz, Barkin & Mitchell, Union, NJ, for Jack Liebsch, III and Stuart J. Flum.

Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ, for Jeffrey C. Starr, Carol Starr, Leslie Susser and Janice Foley for Carolyn Foley.

Andrew Robert Jacobs, Fitzsimmons, Ringle & Jacobs, P.C., Newark, NJ, for David Berlin.

James Bashian, Law Office of James V. Bashian, Fairfield, NJ, for Robert Bronstein.

Robert A. Hoffman, Barrack, Rodos & Bacine, Haddonfield, NJ, for William A. Gruenberg Family Trust A.

Peter L. Masnik, Kalikman and Masnik, Haddonfield, NJ, for Mary L. Cochran.

Jeffrey J. Greenbaum, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A., Newark, NJ, for Children's Place Retail Stores, Inc., Seth Udason, Ezra Dabah, Stanley B. Silver and Stanley Silverstein.

Scott T. Tross, Herrick, Feinstein, Princeton, NJ, for John Megrue and David J. Oddi.

Richard Edward Kummer, Kummer, Knox, Naughton & Hansbury, PC, Parrsippany, NJ, for Donaldson, Lufkin & Jenrette Securities Corp., Smith Barney, Inc., Legg Mason Wood Walker, Inc., SK Equity Fund, L.P., SK Investment Fund, L.P., Saunders Karp & Megrue, L.P. and Nationsbanc Montgomery Securities, Inc.

## MEMORANDUM & ORDER

LIFLAND, District Judge.

Presently before the Court is plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23. For the reasons set forth herein, the motion will be granted in part and denied in part.

### BACKGROUND

The Children's Place is a specialty retailer of apparel and accessories for newborn to twelve-year-old children. On September 18, 1997, pursuant to a Registration Statement and a Prospectus which was incorporated into the Registration Statement (collectively, the "Prospectus"), Defendants sold four million shares of Children's Place stock in an initial public offering ("the IPO") at the price of $14 per share. Prior to the market opening on October 14, 1997, the Company announced that its sales for the third quarter would be significantly lower than anticipated and that future earnings would be adversely affected by excessive inventory levels. In response to this announcement, the price of the Company's stock fell to $7,531 per share, representing a decline in value of 46% in less than one month.

Several complaints were filed following the Company's October 14th announcement. These cases were subsequently consolidated by the Court and on February 26, 1998, the First Consolidated Amended Complaint ("FAC") was filed on behalf of the named plaintiffs individually, and on behalf of a class of persons who purchased shares of Children's Place common stock pursuant to the

Prospectus issued in connection with the IPO (collectively, "plaintiffs"). A Second Consolidated Amended Class Action Complaint was filed on October 5, 1998 ("SAC").

The SAC alleges that the Prospectus contained misleading statements or omissions in violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933. Some of the misleading statements allegedly made by the defendants were about the Company's "ability to monitor its sales and inventory" through the use of its "highly touted POS System," a "point-of-sale tracking system that monitors the Company's sales and inventory levels at each of its 140 stores." Specifically, plaintiffs point to the following statements made in the Prospectus:

> Unit and dollar sales information is updated daily in the merchandise reporting systems by polling each store's POS [point-of-sale] terminals. Through automated nightly two-way electronic communication with each store, sales information, payroll hours and other store initiated transfers are uploaded to the host system, and price changes and other information are downloaded through the POS devices. (Prospectus at 35).

> The merchandise planning team also monitors current and future inventory levels on a weekly basis and analyzes sales patterns to predict future demand for various categories.... The merchandise planning team is also responsible for planning and allocating merchandise to each store based on sales volume levels for each department, category and key basic item and other factors. (Prospectus at 30).

> The Company evaluates information obtained through daily reporting to identify sales trends and to implement merchandising decisions regarding markdowns and allocation of merchandise. (Prospectus at 35).

> The Company also intends to replace its POS software during fiscal 1998 to enhance customer service and communication between the Company's central office and its stores. (Prospectus at 34).

However, according to plaintiffs, "[p]rior to and at the time of the Offering, the POS System was highly problematic as it seized up or shut down on numerous occasions, causing the Company to lose critical sales and inventory data in the process." These "malfunctions were so widespread and problematic that the Company was already committed to replacing the system in Fiscal 1998." Therefore, plaintiffs assert that the statements made by defendants in the Prospectus were "materially false and misleading at the time they were made, as they merely presented the capabilities of the POS System without disclosing the widespread problems that the Company was experiencing with the POS System at the time the statements were made."

Plaintiffs seek to represent a class consisting of all persons who purchased or otherwise acquired the common stock of The Children's Place between September 18, 1997, the date of the company's initial public offering, and October 13, 1997, inclusive, because of a false and misleading Prospectus and Registration Statement issued in connection with the IPO.

Defendants concede that a class should be certified, but object to the scope of the class plaintiffs seek to certify. Defendants submit that a class should be certified to include only the IPO purchasers, as follows:

> All individuals who purchased directly from the Company's underwriters any of the 4,000,000 shares of The Children's Place Retail Stores, Inc. common stock in the Company's initial public offering commenced on September 18, 1997, excluding defendants and related persons or entities.

In support of their argument that the class should be limited to initial purchasers, defendants contend that sections 11 and 12 of the Securities Act of 1933 regulate only new public offerings and do not afford a remedy to secondary purchasers.

Defendants also object to one of the proposed class representatives, Daniel T. Polner, because he is a former employee of Legg Mason Wood Walker, Inc., an underwriter in this action. Defendants contend that Polner had unique access to information concerning the issuer while employed at Legg Mason and that therefore his claims are not typical of those of the ordinary investor.

*DISCUSSION*

A. Scope of the Proposed Class

Defendants argue that the class should not include secondary purchasers because secondary purchasers do not have standing to assert claims under sections 11 and 12 of the Securities Act of 1933. As standing is a threshold inquiry, the Court will address the scope of the class prior to determining whether class certification is appropriate in this action.

*Section 12:* Section 12 provides that any person who

> offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(2).[1]

In *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), the Supreme Court held that "[t]he intent of Congress and the design of the statute require that § 12(2) liability be limited to public offerings." *Id.* at 578, 115 S.Ct. 1061. In that case, the Court determined that casual communications between buyers and sellers in the aftermarket do not give rise to an action for rescission under section 12. *Id.* In so finding, the Supreme Court determined

that section 12(a)(2) applies only to public offerings "by issuers and their controlling shareholders." *Id.* at 576, 115 S.Ct. 1061. The Court noted:

> Congress contemplated that § 12(2) would apply only to public offerings by an issuer (or a controlling shareholder). The House Report stated: "The bill affects only new offerings of securities..... It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering." H.R.Rep. No. 85, 73d Cong., 1st Sess., 5 (1933). The observation extended to § 12(2) as well.

*Gustafson,* 513 U.S. at 580, 115 S.Ct. 1061.

Prior to *Gustafson,* in *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3d Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), the Third Circuit had also held that section 12(2) does not afford a remedy to a buyer of securities in the secondary market. *Ballay* involved misrepresentations by a brokerage house that were relied upon by buyers of the security and the issue was whether section 12(a)(2) of the 1933 Act creates a cause of action for an oral misrepresentation in the secondary market. However, "[s]econdary market purchases of registered securities are arguably subject to § 12(2) during the period following effective registration when prospectus delivery is required of dealers, e.g., 90 days for initial public offerings." Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 2.3(125) at 2:50.5 (2d Ed.1999).

Plaintiffs argue that a redistribution takes on the characteristics of a new offering if the plaintiff purchases within the 25–day mandatory prospectus delivery period. Plaintiffs note that while secondary market redistributions of securities do not ordinarily require that the prospectus be provided, Congress has recognized that secondary market transactions must involve a prospectus when they are temporally close to the inception of an IPO. The secondary market transactions at issue here transpired between September 18, 1997, the date of the IPO's inception, and

---

**1.** Subsection 12(2) was recodified as section 12(a)(2) in 1995.

October 13, 1997, thereby rendering them subject to both the prospectus requirement of 15 U.S.C. § 77d(3)(B) and the reduced, 25–day mandatory prospectus period defined by the SEC. 17 C.F.R. § 230.174(d).

In support of this argument, plaintiffs rely on *Wade v. Industrial Funding Corp.*, 1993 WL 650837 (N.D.Cal. Aug. 30, 1993), where the court concluded that "[b]ecause Section 4(3)(B) of the Securities Act, 15 U.S.C. § 77d(3)(B), statutorily extends the period of an initial public offering by ninety (90) days following the commencement of the offering, those Plaintiffs who purchased within this period did so in such a way that retained the characteristics of the new offering." However, in that case, "[a]ll persons who purchased IFC shares during this 90 day post-offering period received a copy of the prospectus from sources privy to inside information regarding IFC, and their purchases thus retained the characteristics of the new offering."

Plaintiffs also rely on *Levitin v. A Pea in the Pod, Inc.*, 1997 WL 160184, 1997 U.S.Dist. LEXIS 4985 (N.D.Tex., March 31, 1997). In that case, the court held that "[o]ne characteristic of a new offering is the mandatory delivery of a prospectus for a specified time. Any redistribution of that stock within the statutory period of time takes on the characteristics of a new offering."

■ The Court is persuaded that secondary market transactions for which the distribution of a prospectus is statutorily required are "redistributions" which take on the "characteristics of a new offering." The legislative history of § 12(a)(2) indicates that Congress sought to ensure truthful dealing in transactions where the prospectus defined the information environment and therefore the price expectations of a security:

The statements for which [liable persons] are responsible, although they may never actually have been seen by the prospective purchaser, because of their wide dissemination, determine the market price of the security. H.R.Rep. No. 85, 73d Cong., 1st Sess., 10 (1933).

As stated in *Gustafson*, the Securities Act of 1933 recognizes that during the early phases of a security's existence, the representations of its issuer and underwriters may be the only source of truthful information concerning market value. 513 U.S. at 581, 115 S.Ct. 1061. The Act singles out transactions during these crucial phases by imposing on the issuer or underwriter a duty to provide a truthful prospectus. § 12(a)(2) liability is predicated on that duty: "[T]he liability imposed by § 12(2) cannot attach unless there is an obligation to distribute the prospectus in the first place." *Id.* at 571, 115 S.Ct. 1061. Congress's concerns about prospectus requirements and the influence a prospectus has on price and purchasers should govern the scope of § 12(a)(2) liability, more so than mere primary or secondary market status of the transaction.

■ Thus, the Court concludes that because the secondary market transactions in this case are sufficiently analogous to initial public offerings as to carry the same duties of disclosure, those duties should, in turn, be enforced by § 12(a)(2). Therefore, all of the proposed class members have standing under § 12(a)(2).

*Section 11:* Section 11 provides:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, per-

son performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security. .

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

15 U.S.C. § 77k(a).

■ The Court in *Gustafson* noted that an earlier decision, *United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), interpreted "the one provision of the Act that extends coverage beyond the regulation of public offerings, § 17(a) of the 1933 Act." *Gustafson*, 513 U.S. at 576, 115 S.Ct. 1061. This language implies that section 11 only regulates public offerings. The Court explained that

the legislative history relied upon in *Naftalin* showed that Congress decided upon a deliberate departure from the general scheme of the Act in this one instance and "made abundantly clear" its intent that § 17(a) have broad coverage. *See* [*Naftalin*, 441 U.S. at 778, 99 S.Ct. 2077] (quoting legislative history stating that " 'fraud or deception in the sale of securities may be prosecuted regardless of whether . . . or

not it is of the class of securities exempted under sections 11 or 12,' " S.Rep. No. 47, 73d Cong., 1st Sess., 4 (1933)).

*Gustafson*, 513 U.S. at 577–78, 115 S.Ct. 1061. Furthermore, the Third Circuit has noted that if a plaintiff's "shares were purchased in the secondary market, they would not be linked to a registration statement filed during the class period, and the § 11 claim would fail." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 286 (3d Cir.1992). Thus, purchasers on the secondary market have no cause of action under section 11. *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 575 (D.N.J.1996). Unlike the requirement of prospectus distribution for an extended period of time, Congress has not required the distribution of the registration statement for a period after an IPO as a necessary safeguard of secondary market transactions. Therefore, the Court concludes that secondary market purchasers do not have standing under § 11.

*Section 15:* Section 15 provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k [§ 11] or 77*l* [§ 12(a)(2) ] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist. 15 U.S.C. § 77*o*.

"[L]iability under § 15 of the 1933 Act is premised on liability under § 11 or § 12." *Gannon*, 920 F.Supp. at 576. Therefore, the secondary purchasers' standing under § 15 is coterminous with the scope of their claims under § 12(a)(2) and does not extend to claims under § 11.

Because secondary purchasers do not have standing to sue under § 11, they may not be included within the class with respect to such

claims. However, the Court may certify the class to include secondary purchasers with respect to claims arising under §§ 12(a)(2) and 15 (insofar as they arise of out § 12(a)(2) liability).

## B. Requirements for Class Certification

■ Rule 23 of the Federal Rules of Civil Procedure sets forth four general preconditions that putative class representatives must satisfy before any case is certified as a class action:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Additionally, Rule 23(b) defines four different types of class actions, and the party seeking certification must demonstrate that the case falls within one of the Rule 23(b) categories. The plaintiffs bear the burden of proving that the proposed class action satisfies each of the requirements of Rule 23(a) and one of the prerequisites of Rule 23(b). *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir.1994).

■ A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, the court may find it necessary to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996).

■ *Numerosity:* Rule 23(a) requires that the members of the proposed class be so numerous as to make joinder of each potential member impracticable. *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 406 (D.N.J.1990). In establishing sufficient numerosity within a securities trading environment, plaintiffs need not specify the exact number of class members, but may instead estimate on the basis of the size of a disputed offering. *Shamberg v. Ahlstrom*, 111 F.R.D. 689, 698 (D.N.J.1986). While there is no specific numerical threshold for certification, courts have generally ruled that classes may be certified even in situations where the potential class has as few as 92 members. *Weiss v. York Hospital*, 745 F.2d 786, 808 (3d Cir.1984). Furthermore, plaintiffs may further strengthen claims of joinder impracticability by asserting that the members of a proposed class are geographically scattered, thus creating practical difficulties in organizing a non-representative action. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 132 (1st Cir.1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). In fact, the Fifth Circuit has held that there is a presumption that Rule 23(a) is satisfied in securities suits involving nationally traded stocks. *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981).

■ In the instant case, the defendants sold at least 4,000,000 shares of Children's Place stock pursuant to the IPO. This suggests the possibility of a substantial number of purchasers. While the exact number of purchasers is unknown to plaintiffs and must be ascertained through discovery, plaintiffs have estimated that there are at least hundreds of members of the class. Obviously, dealing with a potential class of such size through joinder would result in administrative difficulties and duplicative actions. Moreover, since the stock at issue was sold on the NASDAQ national market, the presumption in favor of certification articulated in *Zeidman* should apply. Thus, the Court finds that the potential class described by plaintiffs is sufficiently numerous under Rule 23(a).

■ *Commonality:* Rule 23(a) also requires that there be questions of law or fact common to the class. All questions need not be common, but the commonality requirement may be satisfied if the plaintiffs share at least "one question of fact or law with the grievances of the prespective class." *Baby Neal*, 43 F.3d at 56. In the instant case, each plaintiff alleges that the defendants issued a false and misleading prospectus in conjunction with the IPO. Therefore, the

Rule 23(a) commonality requirement is satisfied in this case.

*Typicality:* Rule 23(a) also conditions class certification on the plaintiffs establishing that the legal positions of the representative parties are "typical" of the absent class members. Plaintiffs' claims meet the typicality requirement if they "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of the class members, and ... [are] based on the same legal theory." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir.1992). Conversely, a representative's claims would be atypical if his or her "factual or legal stance is not characteristic of that of the other class members." *In re Milestone Scientific Securities Litig.*, 183 F.R.D. 404, 415 (D.N.J.1998). Furthermore, not only must the representative's claims spring from the same defendant conduct as those of the represented parties, but, in pursuing those claims, the representative must not have "interests antagonistic to the class," i.e., the representative's motivation cannot be other than obtaining a beneficial outcome for the class. *Id.* at 923.

In the instant case, the representatives' claims and those of the class members clearly arise out of the same defendant conduct, that is, the production and distribution of allegedly false and misleading documents by the defendants in connection with the IPO. Thus, the representatives allege injury from a course of conduct that affected all aggrieved parties in the same fashion.

Despite this facial typicality, defendants assert that a proposed representative, Daniel T. ·Polner, should be disqualified because he has a different factual position vis-a-vis the defendants than the absent members and because his claims are potentially antagonistic to those of the absent members because of this position.

Defendants' objection to Polner hinges upon his status as an employee of defendant Legg Mason Wood Walker, Inc. from March 1994 through May 1997. According to his deposition, during the course of this employment, Polner talked with other Legg Mason employees about a private placement transaction involving The Children's Place. Polner never worked on the IPO and learned only general information about the company, such as the nature of its products, its expansion strategies, and its growth potential. Defendants assert that this additional information confers an atypical status on Polner. Moreover, defendants argue that Polner's status as a former employee might give rise to interests antagonistic to those of the class by prompting him to hesitate in pressing the claims or to overzealously pursue the litigation.

According to Polner's deposition, he had only the general information to which all investors who had read the prospectus would have been privy. At any rate, the Court will assume that Polner purchased with the belief that the company's prospects were good. Furthermore, since liability is not based on a plaintiff's actual exposure to a particular prospectus in making a buying decision, but merely upon his purchase of a security in a price environment based on that prospectus, Polner stands in the same place as other class members. His claims are not atypical.

*Adequacy:* Rule 23(a) requires that representative parties will fairly and adequately represent the class, a condition which the Third Circuit has held to be satisfied if it appears that (1) plaintiffs' interests are not antagonistic to those of other members of the class they seek to represent, and (2) plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation. *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Both of these requirements are met in the present case. The Court finds no antagonism between the claims of the representatives and those of the other class members, and plaintiffs' attorneys are both experienced and qualified.

*Rule 23(b)(3):* Plaintiffs have moved for class certification under Fed.R.Civ.P. 23(b)(3). In order for a class action to be certified under Rule 23(b)(3), the putative class representatives must show, in addition to the four general prerequisites of Rule 23(a), that:

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). Whether "questions of law or fact common to members of the class predominate over any questions affecting only individual members" may be referred to as the predominance inquiry. The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy ..." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.*

The Supreme Court has noted that the predominance requirement is not met when there exist a greater number of questions peculiar to the several categories of class members and to individuals within each category, where such uncommon questions are significant. *Id.* The predominance inquiry must also focus upon the cohesiveness of the class as to commonality of remedies. *Id.*

■ The predominance inquiry must also consider applicable law: common questions of law may be said to predominate when significant legal issues are common to each class member's cause of action or to the defense of such claims. Thus, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws ... Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Id.*

■ Common issues must be shown to predominate, but individual issues can also exist. All class members need not be identically situated with respect to all issues so long as their claims are not in conflict with each other. *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). These

individual differences must be of lesser overall significance and they must be manageable in a single class action.

■ In this case, plaintiffs allege that the prospectus issued by defendants contained materially false and misleading statements in violation of the Securities Act of 1933. Such misrepresentations allegedly detrimentally impacted each class member in the same manner. Each plaintiff's most crucial issues of fact and law arise out of this common activity. Each class member seeks to prove the same falsities, in the same documents, with the same resultant damages. The only difference in legal position among class members, that stemming from the distinction between a primary market purchaser who can sue under § 11 and a secondary market purchaser who cannot, in no way outweighs the commonality among the plaintiffs' claims. Thus, the predominance requirement of Rule 23(b)(3) is satisfied.

■ In addition to the predominance requirement, Rule 23(b)(3) requires that class action treatment be the most fair and efficient method of managing the plaintiffs' claims. Class actions are often the most fair and practical vehicle for plaintiffs' claims in securities suits because "those who have been injured are in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive." *Zinberg*, 138 F.R.D. at 410. In this case, because individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation. Furthermore, since the number of individual claims may be in the thousands, the actions of one defendant could potentially burden the dockets of courts in numerous states with multiple suits. The Court finds that the class action vehicle is also desirable in that it would eliminate the possibility of inconsistent adjudication. Therefore, the Court concludes that claims stemming from the IPO are best handled through a class action.

Accordingly, **IT IS** on this 23rd day of August 1999 **ORDERED** that plaintiffs' motion for class certification is granted in part and denied in part. A class is certified consisting of plaintiffs who purchased as part of

the initial public offering for all claims alleged in the Complaint. A sub-class of plaintiffs who did not purchase directly in the IPO is also certified as to their section 12(a)(2) claims and as to their section 15 claims (insofar as they arise out of section 12(a)(2) liability)