**McKOWAN LOWE & CO., LTD., Plaintiff,**

v.

**JASMINE LTD., et al., Defendants,**

**Harry Berger, individually and on behalf of a class similarly situated, and Bernard Cutler, individually and on behalf of a class similarly situated, Plaintiffs,**

v.

**Jasmine Ltd., et al., Defendants.**

Nos. 94–CV–5522, 96–CV–2318.

United States District Court, D. New Jersey.

June 30, 2000.

Brian Clobes, Miller, Faucher, Cafferty and Wexler LLP, Philadelphia, PA, Marshall Seeder, John W. Moynihan, Sachnoff & Weaver, Ltd., Chicago, IL, Ronald L. Futterman, Michael I. Behn, Futterman & Howard, Chtd., Chicago, IL, for Plaintiffs.

Nicholas M. Kouletsis, Barbara M. Mather, Pepper Hamilton LLP, Cherry Hill, NJ, John M. George, Jr., Nancy A. Temple, Lisa M. Cipriano, Sidley & Austin, Chicago, IL, for Defendant Arthur Andersen LLP.

Richard A. Roth, Littman Krooks Roth & Ball P.C., New York City, NY, for Defendants Sands Brothers & Co., Ltd., Steven B. Sands and Martin Sands.

## OPINION

RODRIGUEZ, District Judge.

This matter is before the court on defendant Arthur Andersen LLP's motion for summary judgment on plaintiffs' claims against it brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and on plaintiff Harry Berger's state law claims, and on plaintiff Harry Berger's motion to file a surreply in opposition to the summary judgment motion.

### I. *BACKGROUND*

A. *The Parties*

Plaintiff Harry Berger is a resident of Winnetka, Illinois who purchased 2700 shares of Jasmine stock on January 11, 1994. Plaintiff Bernard Cutler is a resident of Cherry Hill, New Jersey who purchased 1000 shares of Jasmine stock on December 16, 1993 from Sands Brothers & Co., Ltd.

Defendant Jasmine, a Delaware corporation with its principal executive offices in Pennsauken, New Jersey, is an importer and supplier of women's footwear and handbags. Irving Mangel was its Chief Executive Officer, President, and Chairman of the Board. Samuel Mangel was its Vice President, Secretary, and Managing Director of Overseas Production and Sourcing. Melvin Twersky was the Managing Director of Sales and Marketing, Edward Maskaly the Managing Director of Finance and until March 1994, Chief Financial Officer, and Thomas Ciocco was the Treasurer and Controller.

Defendant Sands Brothers & Co., Ltd., is a licensed broker/dealer located in New York, New York. Although primarily engaged in investment banking, it functioned as the underwriter for the initial public offering of Jasmine's stock. Both defendants Martin Sands and Steven B. Sands are principals of the company and were named directors of Jasmine pursuant to the procedure detailed in the Prospectus for Sands Brothers & Co., Ltd. to nominate two designees to Jasmine's board subsequent to the initial public offering.

Defendant Arthur Andersen L.L.P. is an independent accounting/auditing firm headquartered in Chicago, Illinois. Andersen's Philadelphia, Pennsylvania office prepared audited financial statements in 1993 for use in the Prospectus provided in conjunction with the initial public offering of Jasmine's stock. Andersen's Report of Independent Public Accountant dated November 22, 1993 was included in a Registration Statement containing a prospectus dated December 15, 1993.

Defendant McKowan Lowe, a Hong Kong corporation registered to conduct business in New Jersey, was Jasmine's exclusive purchasing agent in the Far East. Evelyn Wong, a citizen of Hong Kong, is McKowan's Chief Financial Officer. Tony Ngai, also a citizen of Hong Kong, is a Senior Director of the company.

B. *Facts*

1. *Nature of the Action*

This action stems out of the events surrounding the initial public offering of defendant Jasmine Ltd.'s ("Jasmine's") stock in December of 1993. According to the Amended Class Action Complaint, filed July 15, 1999, in order to achieve a successful initial public offering ("IPO"), the defendants caused or participated in the sale of shares of Jasmine pursuant to the Registration Statement and Prospectus which contained numerous misrepresentations and omissions of material fact. Additionally, plaintiffs allege that subsequent to the IPO, the defendants continued to make material misstatements and misrepresentations about the financial information which had been contained in the Registration Statement and Prospectus and about Jasmine's financial condition for the quarters ending December 31, 1993, March 31, 1994, and June 30, 1994, including in filings with the Securities and Exchange Commission ("SEC"). It is alleged that, as a result of defendants' wrongdoing, numerous shareholders like plaintiffs purchased now-worthless Jasmine stock at inflated prices.

2. *Events Leading to the IPO*

According to the Amended Class Action Complaint, during the period leading up to its IPO, Jasmine had become insolvent.[1] Plaintiffs allege that the Jasmine and McKowan defendants engaged in various fraudulent activities which would allow the IPO to proceed.

Allegedly, at the time of the IPO, Jasmine owed McKowan approximately $15 million. In an attempt to make the prospectus more appealing and provide Jasmine with the funds necessary to pay off the debt, the parties, plaintiffs contend, attempted to conceal a large portion of this amount through fraudulent accounting practices.[2] Plaintiffs claim that false certifications were supplied to Andersen in the process of preparing the audited financial statements. Plaintiffs also claim that Andersen accepted the false certifications without confirming the actual debt owed by McKowan and without further inquiry. Thus, the financial statements did not reflect the actual amount owed to McKowan at the time the prospectus was issued.

Plaintiffs also allege that Jasmine falsely inflated its 1993 income though a sham sale to McKowan of an option to purchase Lucky Leader Trading Ltd. ("Lucky Leader"), an entity created and controlled by Jasmine as its purchasing agent in Asia. According to the Amended Class Action Complaint, the sale was through accounting entries only, as McKowan paid no money or other consideration. This paper transaction had the sole purpose, plaintiffs conclude, of allowing Jasmine to record an unrealized gain of approximately $1.16 million to make Jasmine appear profitable and allow the IPO to proceed.

Additionally, plaintiffs maintain that there were several material misrepresentations contained in the prospectus and 1993 financial statements, including Andersen's audit report and the extensive discussion

1. According to plaintiffs, Jasmine's long term debt was approximately $23 million, with approximately $15 million of that amount being owed to McKowan (and $8,750,000 being owed to Meridian Bank). Am. Class Action Compl. at ¶ 20. The existence and validity of this debt was the subject of the *McKowan v. Jasmine Ltd.* action. In addition, plaintiffs allege that Jasmine's earnings were virtually non-existent. *Id.* at ¶¶ 21, 22.

2. Ultimately, plaintiffs allege that approximately $13.3 million of debt was transferred and concealed with a "side loan" created

between McKowan and Jasmine for the same amount. Am. Class Action Compl. at ¶¶ 27–29. Consequently, at the time of the IPO, Jasmine's records reflected a debt to McKowan of only approximately $2.6 million. *Id.* at ¶ 30. Lujaco, Ltd., a Pennsylvania corporation with Irving M. Mangel as president and Samuel J. Mangel as secretary, allegedly assumed the obligation to repay the side loan in furtherance of the scheme, however, the parties, according to plaintiffs, acknowledged the true debt owed. *Id.* at ¶¶ 31–32.

of the information about Jasmine contained therein.

### 3. Post IPO Misrepresentations

After the IPO opened, Martin Sands made public statements about Jasmine's stock and its potential for success which allegedly contained misleading, unfounded, and false claims of future earnings and acquisitions. Plaintiffs claim that these statements were made because Sands Brothers, as underwriters and Jasmine directors, stood to profit handsomely if the venture was successful.[3]

In the meantime, plaintiffs contend that the Jasmine defendants continued their scheme to defraud by filing quarterly 10–Q reports with the Securities Exchange Commission which contained material misstatements and omissions. Plaintiffs further allege that Jasmine filed a false and misleading Form 8 K report, intentionally omitting the fact that Andersen, during its audit of the 1994 financial statements, withdrew after disagreements with Jasmine management which could have caused it to modify its previously unqualified 1993 audit report.[4]

### C. Procedural History

After Jasmine's stock became essentially valueless, plaintiff filed a complaint in the United States District Court for the Northern District of Illinois, alleging that the actions of the Jasmine defendants and Sands Brothers constituted violations of, among other things, federal and state securities fraud laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Upon

plaintiff's motion, the case was transferred to this court on May 13, 1996. Soon thereafter, on June 10, 1996, plaintiff filed an Amended Complaint which added the McKowan defendants as parties.[5] A Second Amended Complaint was filed on November 18, 1996, adding Andersen as a defendant. The Third Amended Complaint, filed on April 22, 1997, added Fishbein as a defendant and raised additional claims against the Sands Brothers.

In lieu of answering the second amended complaint, the defendants filed their respective motions to dismiss. With these motions pending, both Andersen and the McKowan defendants applied for a stay of discovery under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77a et seq. In denying the stay of discovery, the Honorable Robert B. Kugler, U.S.M.J., determined that the Reform Act did not apply. That ruling was affirmed by this court on May 19, 1997.

On May 8, 1997, plaintiff was granted leave to file a Third Amended Complaint, which was filed on May 16, 1997. Because the Third Amended Complaint had the potential of impacting defendants' various arguments in their motions to dismiss the Second Amended Complaint, and in anticipation of the filing of a Revised Third Amended Complaint, this Court dismissed all defendants' motions as moot on August 11, 1997. Defendants were given the opportunity to renew their motions against the Revised Third Amended Complaint, incorporating any of their previous submissions that remained applicable. They did so, and on December 1, 1997, this Court

3. At the time the statements were made and published, Sands had not revealed that Sands Brothers was the underwriter of Jasmine's IPO. However, a public retraction of the statements was made the next day.

4. After Andersen withdrew as independent auditor, the accounting firm of BDO Seidman was retained by Jasmine to audit its 1994 financial statements. According to the Amended Class Action Complaint, BDO Seidman also withdrew from the audit in March

1995 after discovering inconsistencies with Jasmine's representations, which were reported to the SEC. Am. Class Action Compl. at ¶¶ 57–63.

5. On August 14, 1996, after the McKowan defendants were named as parties in Berger, the case was consolidated with McKowan v. Jasmine Ltd. McKowan voluntarily dismissed its case on February 19, 1999.

granted in part and denied in part these motions.

In the December 1, 1997 Order, this Court read *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 286 (3d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992), as interpreting the provision in Section 11 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77k, that "any person acquiring a security issued pursuant to a false or misleading registration statement may recover damages", to mean that a plaintiff need not have purchased stock during the IPO, but that a plaintiff merely must prove that his purchased shares "are traceable to a false or misleading registration statement." The Court stated:

> Reliance on the registration statement is not necessary if the stock is purchased less than twelve months after the effective date.[6] 15 U.S.C. § 77k(a). If, however, the shares were purchased in the secondary market, "it would not be linked to a registration statement filed during the class period and the § 11 claim would fail." *Shapiro*, 964 F.2d at 286.

Here, Jasmine's IPO was filed with the SEC on December 15, 1993. After the IPO was closed on December 22, 1993, Sands Brothers exercised an option to purchase an additional 250,000 overalloted shares on January 7, 1994. Third Am. Compl. at Ex. B, p. 5 (10-Q Report for period ending Dec. 31, 1993). Plaintiff claims to have purchased his shares, pursuant to the registration statement and prospectus, directly from Sands Brothers on January 11, 1994.

Therefore, it is possible that plaintiff can prove that these shares were not purchased in the secondary market and can be traced to those issued pursuant to the IPO.[7] *Shapiro*, 964 F.2d at 286.

Furthermore, the requirement that the shares be "traceable" to the registration statement would be meaningless if § 11 was applied only to the limited window of the IPO. Plaintiff purchased the stock less than three weeks after the IPO officially closed. Section 11 liability is narrowly focused on the registration statement. Since this purchase was so close in time to the original issuance of stock, it seems unlikely that indicators other than the registration statement, such as quarterly financial reports for example, could have been disseminated and relied on in plaintiff's decision to purchase. "Because we cannot say that plaintiffs can prove no set of facts that would entitle them to relief, the § 11 claim cannot be dismissed at this time." *Id.*

December 1, 1997 Order, pp. 9–10.

The Court dismissed the claim against Andersen for liability under Section 15, finding that Andersen was not a "controlling person" under that section. It held, however, that the McKowan defendants could be "controlling persons" and therefore could be sued under Section 15. The Court then dismissed plaintiff's conspiracy liability claims against the Jasmine and McKowan defendants.

Regarding the statute of limitations, the Court found:

**6.** Accordingly, the various defendants' motion for dismissal based upon plaintiff's failure to allege actual reliance for the § 11 claim is without merit.

**7.** This scenario is distinguishable from *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566 (D.N.J.1996). In *Gannon*, the plaintiff purchased shares of his employer's corporate parent's stock through incentive savings plan on the "open market." *Id.* at 575. The court concluded that this, by definition, was not

> pursuant to an initial public offering, and thus held that plaintiff failed to state a claim under either 15 U.S.C. § 77k, or 15 U.S.C. § 77*l*. *Id.* In contrast, the plaintiff in the present case alleges that his shares were purchased pursuant to the initial public offering. In light of the foregoing discussion, *Gannon* can not be construed to hold that plaintiff must plead that the stock was purchased during the limited time frame of the IPO just to state a claim upon which relief may be granted.

An action under § 11 of the 1933 Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence...." 15 U.S.C. § 77m; *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1550 (3d Cir.), *cert. denied*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). Because § 15 control person liability is derivative of § 11 liability, the same limitations period applies. *Wiley [v. Hughes Capital Corp.]*, 746 F.Supp. [1264,] 1277 [ (D.N.J.1990) ]; *Insurance Consultants of America, Inc. v. Southeastern Insurance Group, Inc.*, 746 F.Supp. 390, 404 (D.N.J.1990). Moreover, "[t]he statute of limitations of section [11] of the 1933 Act runs not from 'the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather [from] the time at which plaintiff *should* have discovered the general fraudulent scheme.'" *Insurance Consultants*, 746 F.Supp. at 405 (emphasis in original) (quoting *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975)). As one court in this circuit explained:

> Whether plaintiffs should have known of their claims in the exercise of reasonable diligence requires consideration of several elements. First, plaintiffs must have sufficient information of possible wrongdoing to place them on "inquiry notice" or to excite "storm warnings" of culpable activity. Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims and are held to have constructive notice of all facts they could have learned through diligent investigation during the limitations period.

*Gruber v. Price Waterhouse*, 697 F.Supp. 859, 864 (E.D.Pa.1988) (footnote and citations omitted), *aff'd*, 911 F.2d 960 (3d Cir.1990); *see also Elysian Federal Savings Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737, 745–46 (D.N.J.1989) (citing *Gruber*).

Plaintiff contends that his complaint was filed within one year of the date of inquiry notice. The initial complaint was filed on November 17, 1995. Defendants claim that plaintiff received adequate notice as early as the registration statement and prospectus were filed with the SEC on December 15, 1993, because the cover page stated Jasmine was a very high-risk stock.... Further, defendants contend that other indicators—such as a drop in price of Jasmine stock in light of representations that it would produce a high return—put plaintiff on inquiry notice.

Viewing the allegations in the Revised Third Amended Complaint in the light most favorable to the non-moving party, plaintiff was first given inquiry notice in the May 19, 1995 form 8–K which disclosed irregularities discovered by BDO Seidman, who succeeded Andersen and shortly thereafter terminated its relationship with Jasmine. Revised Third Am. Compl. at Ex. N. It cannot be said that the warnings in the prospectus by themselves created notice because they did not contradict oral representations made prior to purchase of the stock.[8] *See Insurance Consultants*, 746 F.Supp. at 406 (holding inquiry notice present where oral representation made prior to purchase contradict written representations in offering memoranda). Furthermore, as defendants strenuously point out, Jasmine did experience losses, and these economic conditions were reported in its 10–Q forms as early as February 14, 1994. However, throughout this period, Andersen, one of the "big six" accounting firms, did not adjust its position which approved of Jasmine's finan-

---

8. Indeed, the prospectus did not contain any warnings that the financial status of Jasmine which was certified by Andersen contained misrepresentations and omissions of material facts.

cial statements and economic viability. Additionally, the December 19, 1994 8–K form, while it revealed Andersen withdrew as Jasmine's accountant, did not reveal any discrepancies or irregularities in Jasmine's previous financial statements. Andersen's withdrawal was reported as a "mutual" parting, which does not necessarily infer any potential illicit conduct, and in the context of this motion to dismiss, should not have instinctively "excite[d] 'storm warnings' of culpable activity." *Gruber,* 697 F.Supp. at 864. Therefore, all defendants' motions to dismiss on the basis of the statute of limitations are denied.

December 1, 1997 Order, pp. 15–18.

The Court continued with the statute of limitations issue as applied to actions brought under § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. § 240.10b–5, finding that "the same limitations period applies as with claims brought under § 11 of the 1933 Act" and citing for support *Rolo v. City Investing Co. Liquidating Trust,* 845 F.Supp. 182, 243–44 (D.N.J.1993)[9] ("Accordingly, to have a timely securities fraud claim, plaintiffs here need to allege that (1) they did not know and should not have known that they had a claim for a violation of the securities laws earlier than ... one year before the commencement of this action ... and (2) more than three years had not passed since the violation itself."). Thus, the Court denied dismissal of the § 10(b) claims for the same reasons it denied dismissal of the § 11 claims. December 1, 1997 Order, pp. 20–21.

The Court also declined to dismiss the § 10(b) claim against Andersen on the ground that plaintiff did not properly plead the scienter requirement. The Court

found that scienter may also include reckless behavior which the plaintiff sufficiently pled on Andersen's part. Similarly, the Court declined to dismiss the § 10(b) claim on the ground that the Third Circuit had not answered the question of whether the fraud on the market presumption of reliance applies in a case of newly issued stock because the plaintiff sufficiently alleged reliance on the misstatements and omissions in the prospectus and registration statement to get past the motion to dismiss.

The Court did dismiss plaintiff's federal RICO and RICO conspiracy claims, but allowed the New Jersey RICO claim to proceed. The New Jersey securities fraud claim, and the Illinois securities fraud claim against all but the McKowan defendants also withstood the motion to dismiss. The Court also found that plaintiff stated a claim under the Illinois Consumer Fraud Act and claims for common law fraud and negligent misrepresentation under New Jersey law and under Illinois law against only Sands Brothers and Andersen.

On August 6, 1998, the Court denied plaintiff Harry Berger's motion for class certification of "a class consisting of all purchasers of publically-traded securities of Jasmine, Ltd. who purchased during the period from December 15, 1993 through and including June 20, 1995." Although the Court found the putative class to be sufficiently numerous and found that the commonality requirement in itself did not pose a problem, the Court found Berger to be an atypical class representative. The Opinion stated,

> Indeed, this is not a run-of-the-mill securities fraud case. Plaintiff did not purchase during the limited window of the IPO, but from an over-allotment of shares approximately three weeks after the close of the IPO. Moreover, as Plain-

---

9. *Rolo* was vacated on April 4, 1995 to be reconsidered in light of the Third Circuit's decision in *Jaguar Cars, Inc. v. Royal Oaks Motor Car Company, Inc.,* 46 F.3d 258 (3d Cir.1995); *see Rolo v. City Investing Company Liquidating Trust,* 66 F.3d 312 (3rd Cir.1995).

On remand, the district court held that *Jaguar Cars* did not affect its prior holding regarding the securities fraud claims. 897 F.Supp. 826, 833 (D.N.J.1995), *aff'd* 155 F.3d 644 (3d Cir. 1998).

tiff testified in his deposition, he relied solely on the oral representations of his broker (an employee of Defendant Sands Brothers & Co., Ltd. who was also the underwriter of the IPO) and without even seeing the Prospectus beforehand.... Thus, his reliance on this prospectus or other related documents such as the audit reports and the advice of Plaintiff's broker who was also an insider to the IPO, will be proved differently for Plaintiff than for those class members who may have only seen the prospectus (and/or other documents prepared by some of the named defendants) before purchasing the stock. The time of the purchase of the stock—whether it was purchased during the IPO or the short time frame following the IPO when Plaintiff purchased his shares—causes additional differences in proving each class members' case, possibly even affecting Plaintiff's standing to sue under Section 11. When considering these facts and the many permutations of proving reliance against the many defendants, in addition to the differing factual circumstances, it becomes evident that Plaintiff's claims and their anticipated methods of proof would not be typical of the class he seeks to represent and he has therefore not met the requirement of typicality.[10]

August 6, 1998 Order, pp. 7–9. The Court also questioned the adequacy of representation because plaintiff Berger seemed to know very little about the factual predicate of the lawsuit and about his duties as a class representative. On March 9, 1999, this Court denied plaintiff Berger's motion for reconsideration of the denial of class certification. On May 24, 1999, the United States Court of Appeals for the Third Circuit denied plaintiff's petition for leave to file an interlocutory appeal from the Order denying class certification.

On June 29, 1999, the Honorable Robert B. Kugler, U.S.M.J., granted plaintiff's September 9, 1998 motion to have Bernard L. Cutler intervene as a plaintiff and allowed for an amendment to the complaint in order to do so. In the Amended Class Action Complaint, filed July 15, 1999, plaintiffs again name as class members "all persons other than defendants who purchased shares of Jasmine stock between December 15, 1993, and June 20, 1995 inclusive (the "Class Period")."

On July 16, 1999, Andersen filed a motion to dismiss the Complaint for lack of subject matter jurisdiction, which was joined in by several other defendants, but which was denied by this Court on September 23, 1999.

Also on September 23, 1999, this Court denied plaintiffs' motion to certify a settlement class and preliminarily approve a settlement agreement between plaintiffs and Fishbein & Company, P.C. The Court found that because of Cutler's relationship, through his son-in-law, with Sam Mangel, Cutler brought certain encumbrances to the case not typical of the class members he sought to represent. His reliance on the Prospectus and on the advice of Sands Brothers, rather than on the advice of a Jasmine insider, may have had to be proved differently from other class members. Finally, "[e]ven if he did not rely on any information provided by a Jasmine insider, the Court [saw] that because of his relationships, he will be subject to attacks that other class members would not be." September 23, 1999 Order, p. 11. Quoting Andersen's opposition brief, the Court continued, "The very existence of th[e] issue of Mr. Cutler's [possible] reliance on nonpublic information renders him an atypical

10. In this respect, this case is different from cases such as *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.), *cert. denied sub nom. Weinstein v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). The shortcomings in meeting the typicality requirement in the instant case are not solely based on individual issues of reliance, but on the many unique circumstances that will undoubtedly create "significant variations in the proofs of class members." *See Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 257 (D.N.J. 1992).

and inadequate representative because it would be distracting to focus class resources on these issues to the detriment of a putative class." *Id.* at p. 12. Moreover, Cutler did not meet his burden of showing that his status as a so-called "insider" actually was typical of the class of investors he sought to represent.

On November 12, 1999, Andersen filed the instant motion for summary judgment. On February 1, 2000 plaintiff Berger filed a motion for leave to file a surreply to the motion for summary judgment.

On February 2, 2000, plaintiff Cutler filed a motion for class certification on behalf of all purchasers, other than the defendants, of publicly-traded securities of Jasmine, Ltd. who purchased during the period from December 15, 1993 through and including June 20, 1995. In this newest motion, Cutler asks this Court to certify a class for those claims in Count One and Count Fourteen which were not before the Court in the motion for preliminary approval of the Fishbein settlement and where reliance is not an element. Thus, Cutler seeks certification of his claims under Sections 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77*l*(2), arguing that any relationships he may have had with Jasmine insiders are irrelevant to these claims which do not require a showing of reliance.

## II. *DISCUSSION*

### A. *Andersen's Motion for Summary Judgment*

Arthur Andersen has moved for summary judgment on both the proposed class and the individual federal securities claims of plaintiff Cutler, arguing that those claims are time-barred by the applicable limitations period, which Arthur Andersen asserts was not tolled during the pendency of plaintiff Berger's proposed class action. In addition, Arthur Andersen argues that plaintiff Berger's federal securities law claims also are time-barred, and that, in any event, Berger cannot prove the elements essential to those claims.

### 1. *Summary Judgment Standard*

The entry of summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.; Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1258 (D.N.J.1994), *aff'd* 67 F.3d 291 (3d Cir.1995). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

However, in deciding the motion, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the non-movant has provided evidence exceeding the "mere scintilla" threshold in demonstrating a genuine issue of material fact, the court cannot weigh the evidence and credit the movant's interpretation of the evidence. This is so even if the movant's evidence far outweighs the non-movant's evidence. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

### 2. *Motion as Against Cutler's Claims*

i. Andersen argues that Cutler's proposed class claims are time-barred because equitable tolling does not apply.

The controlling statute of limitations for a Section 11 claim is found in the Securities Act of 1933, and is one year from the time the plaintiff discovered or, after the exercise of reasonable diligence, should have discovered the untrue statements or omissions, but in no event shall the action be brought more than three years after the security was bona fide offered to the public. 15 U.S.C. § 77m. Thus, the Court must determine for a section 11 claim whether and when the plaintiff was under inquiry notice.

■ The "proper period of limitations for a complaint charging violation of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." *In re Data Access Sys. Sec. Litig.,* 843 F.2d 1537, 1550 (3d Cir.) (in banc), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). This period of limitations comes from the Securities Exchange Act of 1934 which does not provide for inquiry notice. *Id.*

In this case, Jasmine's registration statement and prospectus were filed with the SEC on December 15, 1993. The initial Complaint was filed on November 17, 1995. Plaintiffs have argued that they did not receive notice of their claims until May of 1995, and when this case was in the procedural stance of a motion to dismiss, this Court found that plaintiff Berger was first given inquiry notice in the May 19, 1995 form 8 K which disclosed irregularities discovered by BDO Seidman, who succeeded Andersen and shortly thereafter terminated its relationship with Jasmine. Revised Third Am. Compl. at Ex. N. On August 6, 1998, this Court denied plaintiff Berger's motion for class certification. On September 8, 1998, plaintiff Cutler filed his motion to intervene. Thus, absent tolling, Cutler's federal securities claims would be time-barred.

For purposes of this portion of its motion, Andersen assumes that notice of the claims did not occur until May of 1995. Andersen's argument is that the pendency of a class action tolls the limitations period for class members' *individual* claims, but not for additional class action claims by putative members of the original asserted class. Cutler argues that the filing of a class action tolls the running of *any* applicable limitations period for all persons in the putative class; once certification is denied, the period begins to run again. Cutler states that the potential for abuse is in raising new claims, not in perpetuating the rights of putative class members.

The United States Supreme Court has held that "the commencement of an original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *American Pipe and Const. Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The Court reasoned that a federal class

action serves a purpose of efficiency and economy of litigation and is "a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *Id.* at 550, 94 S.Ct. 756. The Court also has stated that such a tolling rule for class actions is not inconsistent with the purposes served by statutes of limitations: putting defendants on notice of adverse claims and preventing plaintiffs from sleeping on their rights. *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 352–53, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) ("Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification."). The clock begins to run anew when the district court denies certification. *In re Westinghouse Sec. Litig.,* 982 F.Supp. 1031, 1033 (W.D.Pa.1997) (citing *American Pipe,* 414 U.S. at 561, 94 S.Ct. 756).

▮ *American Pipe* and its progeny have made clear that the pendency of a previously filed class action tolls the limitations period for a proposed class member's subsequent individual actions. However, neither the United States Supreme Court nor the Third Circuit has decided whether the *American Pipe* tolling rule applies, after a denial of class certification, to class claims brought by a new class representative. The vast majority of the circuits which have examined this issue have declined to expand the *American Pipe* rule beyond individual claims to allow tolling for subsequent class actions. *See, e.g., Basch v. Ground Round, Inc.,* 139 F.3d 6, 10–11 (1st Cir.), *cert. denied,* 525 U.S. 870, 119 S.Ct. 165, 142 L.Ed.2d 135 (1998)("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely. Permitting such tactics would allow lawyers to file successive putative class actions with the hope of attracting more potential plaintiffs and perpetually tolling the statute of limitations as to all such potential litigants, regardless of how many times a court declines to certify the class."); *Griffin v. Singletary,* 17 F.3d 356, 359–60 (11th Cir.1994), *cert. denied sub nom., Florida v. Platt,* 513 U.S. 1077, 115 S.Ct. 723, 130 L.Ed.2d 628 (1995)("[P]laintiffs may not piggyback one class action onto another, and thereby engage in endless rounds of litigation ... over the adequacy of successive named plaintiffs to serve as class representatives." (Internal quotations omitted.)); *Andrews v. Orr,* 851 F.2d 146, 149 (6th Cir.1988)("The courts of appeals that have dealt with the issue appear to be in unanimous agreement that the pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class."); *Korwek v. Hunt,* 827 F.2d 874, 879 (2d Cir.1987)("[T]he tolling rule established by *American Pipe,* and expanded upon by *Crown, Cork,* was not intended to be applied to suspend the running of statutes of limitations for class action suits filed after a definitive determination of class certification; such an application of the rule would be inimical to the purposes behind statutes of limitations and the class action procedure."); *Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir.1987)(" '*American Pipe* and *Crown, Cork* represent a careful balancing of the interest of plaintiffs, defendants, and the court system.' ... We agree with the Second Circuit that to extend tolling to class actions 'tests the outer limits of the American Pipe doctrine and ... falls beyond its carefully crafted parameters into the range of abusive options.' " (Quoting *Korwek* at 879.)); *Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1351 (5th Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986)("Plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any. To the contrary, it has repeatedly been noted that 'the tolling rule [in class actions] is a generous one, inviting abuse,' " (Quoting *American Pipe* concur-

rence.)). Indeed, the general rule is that once class certification has been denied, the pendency of the previously filed class action does not toll the limitations period for later class actions by putative members of the originally asserted class.

In this case, plaintiff Cutler is attempting to certify a class which has already been denied certification by this Court. Thus, a decision on the appropriateness of proceeding as a class has been decided, and Cutler should not be able to force this Court to "engage in endless rounds of litigation over the adequacy or propriety of proceeding as a class." *Griffin*, 17 F.3d at 359. In addition, it is of no moment that Cutler has intervened as a plaintiff and attempted to assert class claims, rather than having filed a separate suit alleging his class causes of action. *See Fleming v. Bank of Boston Corp.*, 127 F.R.D. 30, 36 (D.Mass.1989)(finding it impermissible to use intervention after certification has been denied "to circumvent the statute of limitation by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule."). In a case on all fours with the procedural posture of this case, albeit from another district, the court found "too formalistic" plaintiffs' attempt at distinguishing their case from those outlined above by arguing that the filing of a subsequent complaint is different from the addition of the proposed class representative through amendment to the original complaint. *Fleck v. Cablevision VII, Inc.*, 807 F.Supp. 824, 827 (D.D.C. 1992)("The potential for abuse is the same whichever procedure is used to renew the motion for class certification through the use of a new class representative.").

This Court finds persuasive the rationale discussed within these cases and finds the cases cited by plaintiffs distinguishable in that none of them treated with a case after certification was denied in the first instance. *See, e.g., Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985), *judgment aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)(After district court certified class [11] and tried case, court of appeals found that no named plaintiff adequately represented class for a particular claim. To "salvage" the work of the district court and counsel, appellate court instructed district court to explore the possibility of intervention by qualified class representatives.); *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097 (3d Cir. 1975)(Court applied tolling to allow the amendment of additional class members after an initial grant of class action status had the effect of vesting "the class with a legal status separate from the interest asserted by the nominal plaintiffs."); *Trief v. Dun & Bradstreet*, 144 F.R.D. 193 (S.D.N.Y.1992)(Defendant conceded that the case was appropriate for certification, but contended the named plaintiffs were not adequate. Before the court decided the class certification motion, so with no danger of relitigating decided issues, plaintiffs filed a motion for an "adequate" person to intervene as plaintiff.).

The Court does recognize that two district courts in California and one in Washington, D.C. reached contrary decisions in unreported cases, *In re Quarterdeck Office Systems, Inc. Sec. Litig.*, 1994 WL 374452 (C.D.Cal.1994) and *Shields v. Smith*, 1992 WL 295179 (N.D.Cal.1992); *Shields v. Washington Bancorporation*, 1992 WL 88004 (D.D.C.1992). These cases distinguish the great weight of authority by stating that all of the cases in which the courts held that the statute was not tolled for later class actions involved either an attempt to file an entirely separate class action lawsuit after the dismissal of an earlier action or an attempt to bring a later action after the court had determined that proceeding as a class action was an inappropriate method of resolving the law-

---

**11.** After the court initially certifies a class, persons may have relied on the pendency of the already certified class action to protect their interests, rather than opting out of the class. Where no class was ever certified, reasonable reliance is not an issue.

suit [12], as opposed to allowing an intervening plaintiff, in an attempt to find a more appropriate class representative, to perpetuate the class action. Absent controlling authority to the contrary, however, this Court opts to follow the reasoning established by the circuit courts, as set forth above.

The only other court within this circuit to have addressed this issue came to the same conclusion as this Court:

> [A] contrary rule would allow the attorney for a class to revive the class claims upon denial of certification by simply refiling a new class action using a different putative class member as representative. The attorney would be able to bring a potentially endless succession of class actions, each tolling the [statute of limitations] for its successor. Such a rule would frustrate the principal purpose of the class action procedure—promotion of efficiency and economy of litigation.

*In re Westinghouse Sec. Litig.*, 982 F.Supp. 1031, 1034 (W.D.Pa.1997)(quoting *Smith v. Flagship Int'l*, 609 F.Supp. 58, 64 (N.D.Tex.1985)). It is not difficult to envision this type of "slippery slope" simply serving as a vehicle for attorneys to abuse the *American Pipe* rule.

Although the defendants have been on notice of the claims asserted, because this Court does not definitively believe that class action treatment in this case would be the most efficient manner of resolution for all parties concerned, it finds that the statute of limitations was not tolled for Cutler's class claims. Even assuming that the statute did not begin to run for each of the federal securities claims until May of 1995, Cutler's attempt to assert these claims in September of 1998, more than

one year after they arose, was untimely. Accordingly, summary judgment will be granted on Cutler's federal securities class claims.

ii. Andersen argues that Cutler's individual federal securities claims, based on the theory that Andersen's 1993 Audit Report (included in the Prospectus) was not correct, are time-barred.

 Andersen argues that Cutler's deposition testimony, confirmed by testimony of Robert Bonaventura of Sands Brothers, establishes that Cutler was on actual notice, in that he believed he had been defrauded with respect to the Jasmine investment, by Spring of 1994. Therefore, according to Andersen, the statute of limitations ran by the Spring of 1995 but Berger's suit was not filed until November of that year. On the other hand, plaintiffs argue that this Court already found that plaintiffs' noticing Jasmine's poor performance did not constitute inquiry notice, especially when Andersen also did not see any indications of fraud. Plaintiffs also argue that Andersen presents a skewed version of the testimony, which is subject to conflicting interpretations and therefore must be resolved in favor of the non-movant. In addition, regarding any conflicts or changes in Cutler's deposition testimony between the first and second day of depositions, plaintiffs argue that the law in the Third Circuit precludes summary judgment.

At the outset, the Court notes that Andersen has conceded that the *American Pipe* rule tolled Cutler's individual claims during the pendency of Berger's case. Thus, from November 17, 1995 until August 6, 1998 when class certification was denied, the statute of limitations was

---

**12.** Despite its previous opinion that the case seems to satisfy the numerosity requirement, this Court questions, in light of the record now before it, whether the instant case is even appropriate for class action treatment. After class certification was denied, plaintiffs' attorneys sent an "advertisement" to potential class members, and apparently the best (if not

the only) response received was that of Bernard Cutler. Thus, perhaps the number of parties in the proposed class is not as great as had originally been represented to the Court, such that any interested parties could have intervened or pursued individual lawsuits without burdening the courts.

tolled. The Court also notes that it ruled on a motion to dismiss that plaintiff Berger was first given inquiry notice in the May 19, 1995 form 8–K which disclosed irregularities discovered by BDO Seidman, and that warnings in the prospectus by themselves did not create notice "because they did not contradict oral representations made prior to purchase of the stock.[13] *See Insurance Consultants,* 746 F.Supp. at 406 (holding inquiry notice present where oral representation made prior to purchase contradict written representations in offering memoranda)." December 1, 1997 Order, p. 15.

Now that the case is at the summary judgment stage, Andersen cites to Cutler's deposition testimony. A review of the entirety of his testimony leaves the Court with the impression that Cutler became concerned when the price of Jasmine stock went from the $5.50 per share that he paid down to $2 per share. Exhibit A of Andersen's Appendix, Part II reveals that the price of the stock first closed at $2 on June 23, 1994, although it traded at $2 at some point during the trading day a month before. It closed at $1.75 on July 8, 1994, but went up to close at 3–7/8 on September 15, 1994 before it declined again to close at $1 beginning December 5, 1994, then hovered in the area of $1 until February and March of 1995 when the stock fairly consistently closed below $1.

The first day of his testimony, Cutler made clear that the initial drop in the stock price did not lead him to believe that the Jasmine prospectus figures were not correct, but when the stock continued to go down, and after he spoke with some

people, and certainly after he had received the August 24, 1998 letter from Futterman and Howard, he suspected that the facts presented to him relative to Jasmine were incorrect. Two weeks later, at the second day of his deposition, Cutler testified that he may have felt "gypped" when the stock went down to $2, as if he had made a bad investment, but he always felt "it would come back" because "everything else seemed to be alright" and Sands Brothers did not seem troubled by the declining price. He did admit when led by counsel's question, that the question of whether he had been cheated in his investment in Jasmine, or induced in some way to invest, may have gone through his mind in late Spring of 1994. He also testified, in the end, that he did not feel he had been "cheated" (as opposed to "gypped") until the stock stopped trading in June of 1995.[14] He did not suspect that the information presented in the prospectus about Jasmine's financial condition was not truthful until that time.

Relevant portions of each deposition follow, along with excerpts from the deposition of Bonaventura, a Managing Director and Stockbroker at Sands Brothers.

Q. Mr. Cutler, when you received this August 24, 1998 letter from Futterman and Howard, had you heard of Futterman and Howard before?

A. No.

Q. What did you do when you received this letter in the mail?

A. I was very interested in it and contacted the firm.

Q. Why were you very interested in it?

---

**13.** Indeed, the prospectus did not contain any warnings that the financial status of Jasmine which was certified by Andersen contained misrepresentations and omissions of material facts.

**14.** Plaintiffs' attorneys characterize the 1994 time frame discussed in the first deposition as a "guess", and state that this was understandable given Cutler's age of seventy-six years and the fact that the deposition occurred over four years after the time period in question. During his second deposition, Cutler attempt-

ed to clarify the date, stating that he may have been confused because Jasmine had not been his only stock purchase. Where a witness was confused at an earlier deposition or for some other reason misspoke, a subsequent correcting or clarifying deposition or affidavit may be sufficient to create a material dispute of fact. *Joseph v. Hess Oil,* 867 F.2d 179, 183 (3d Cir.1989)(citing *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 705 (3d Cir.1988)).

A. I don't like to lose money under peculiar circumstances.

Q. Can you tell us what you mean by peculiar circumstances?

A. I feel I was jipped [sic throughout transcript].

Q. Why do you feel that you were jipped?

A. Because the facts that were presented to me relative to Jasmine were very definitely incorrect.

Q. What facts are you talking about that you believe were represented to you relative to Jasmine?

A. Everything I read in the prospectus, except the flowery parts, and of course they always say there is a downfall, but when you read the figures, as I later found out, all the figures were wrong.

Q. When did you believe that you had been jipped, as you put it, in your investment?

A. When I saw the stock dropping. Not initially, but later on.

Q. Do you recall when it was that you saw the stock dropping?

A. Well, it came out December, so I would say the spring of the following year. That would be 1994.

Q. Do you recall that you bought the stock at $5.50 per share?

A. Right.

Q. And what happened to the best of your recollection to the stock price between the time you purchased the stock and the spring of 1994?

A. Well, there was an initial blip up and then thereafter it just started drifting down.

Q. Do you recall approximately how far down it drifted by the spring of 1994?

A. I think it was in the range of $2 to $3.

Q. And was it at that time that you felt that you had been jipped in your investment in Jasmine?

A. I believe so.

Q. Was it at that time that you thought there were peculiar circumstances with respect to your investment in Jasmine?

A. Yes.

Q. Was it the drop in the stock price that led you to believe that the figures in the prospectus were not correct?

A. Not necessarily the initial drop because that happens quite frequently. But it was the drop and later on discussions with people, mainly my son-in-law, who knows Sam Mangel.

. . . . .

Well, like I said, the initial drop is something that happens quite often, but as it proceeded to go down, then the light went on.

Q. You mention that at some point the light went on. What did you mean by that?

A. I became aware that something was wrong.

Q. And to the best of your recollection when did that occur?

A. It's hard to say. Maybe late in the spring.

Q. Late in the spring of 1994?

A. Right.

(Cutler dep., April 14, 1999, pp. 46–49)

A. Well, they said it is a little low but it will be all right; it's only natural; give it time.

Q. Did you receive quarterly reports relating to Jasmine?

A. No.

Q. So you don't recall ever receiving Jasmine's first quarter Q10 report for the quarter ending December 31, 1993?

A. I don't think so.

Q. Do you recall receiving Jasmine's second quarter report for the quarter ending March 31, 1994?

A. I would say no.

Q. Did you ever try to sell any of your Jasmine stock?

A. No.

Q. Did you ever complain to anybody about your Jasmine investment?

A. Yes.

Q. To whom did you complain?

A. My son-in-law. I said it didn't look very good.

Q. Was that based on any other information that you had?

(Cutler dep., April 14, 1999, pp. 150–153)

A. Bought stock of company after reading prospectus which was not correct.

It says date filed January 5th '96.

Q. In 1996 what did you believe was not correct that the prospectus?

A. '96?

Q. Yes. When you filled out this form in 1996 what did you believe was not correct about the prospectus?

A. The information.

Q. What information are you referring to?

A. About the company.

Q. What information about the company?

A. Gross sales, net profit all the way down the line. .... All of it was wrong.... Well, accounts receivable, payable, the whole thing.

A. Because of the way this company went down. It went down so fast.

Q. So the rapid decline in the stock price of Jasmine lead you to believe that the information in the prospectus was not correct; is that fair?

A. Yes, because it was too good to go down like that.

. . . . .

The prospectus stated earnings of about 40 cents and they didn't have earnings of 40 cents.

. . . . .

Well, after speaking to probably someone at Sands I asked how much are they earning, and I asked what about the 49 cents on the prospectus, and he said no, that's not their earnings.

Q. When did you have your discussion with Sands regarding the 40 cents per share earnings?

A. Probably in one of my telephone calls.

Q. And when did that occur, sir?

A. In the spring of '94.

Q. Mr. Cutler, what were you told about Jasmine's earnings when you talked to Sands in the spring of 1994 and inquired about the 40 cents per share earnings?

A. I must have asked how much are they earning and the reply was below 40 cents if anything.

... Well, not from that. It's from later what happened to the stock, and then I recalled what their earnings were stated and how that wasn't the truth.

Q. And during those telephone conversations you inquired about Jasmine's current earnings at that time in 1994; is that true?

A. I must have, yes.

(Cutler dep., April 14, 1999, pp. 158–165)

A. Now on page six you see increasing sales, increasing gross profit, increasing operating income. Income before taxes, net income is very good as far as its increase. And then earnings per share 18 cents, 7 cents wasn't that good but 54 cents looked very good. It increases number of shares too. They still made more money. The ratio of assets liabilities is excellent.

Q. Are you referring to the balance sheet data on this page?

(Cutler dep., April 14, 1999, p. 207)

Q. By August 1994, you knew something was terribly wrong with the Jasmine stock, correct?

A. By terribly, what do you mean?

Q. Well, I think you—I don't want to repeat your prior testimony, but I think you testified by the late spring of 1994 you were—a light went on, to use your language.

A. I don't know if it was '94 now.

Q. Okay. Do you know at what price the stock was when you, the light went on?

A. I'd say around $2, $2 a share.... I said '94 but I think it's probably '95.

Q. Now you think it's spring of '95?

A. Right.

Q. But do you know what the stock price was in March and April 1994?

A. I'm not sure.

Q. Do we agree that the light went on when the stock price was around two, $3 a share?

A. Not three. Say two.

Q. Okay. If I told you that in May of 1994, the stock was at two and an eighth, would that refresh your recollection that, in fact, it was in 1994 that you were concerned?

A. Well, I was concerned but—

Q. And a light went on, correct?

MR. FUTTERMAN: Let him finish his answer, please.

A. I was concerned but I didn't think it warranted my doing anything. Everything else seemed to be all right.... In 1994, I just, I just figured there was something wrong with the stock, but I had hopes that it would come back. Everything else seemed to be all right. At Sands they didn't say anything was wrong.

(Cutler dep., April 29, 1999, pp. 59–64)

Q. Is it the case that you don't recall what year it was, but when the stock was going to $2 a share you knew something was wrong?

A. I probably have my time frames wrong because this isn't the only stock I've been buying and I have many more stocks to look at than this.

Q. Listen to my question, if you could. Isn't it a fact when this stock started going from 5.50 a share in December, when it hit two to $3 a share you became increasingly concerned, correct?

A. I became concerned.

Q. And you thought something was wrong?

A. Something was wrong with the stock, yes, because it was going down.

Q. And, in fact, you thought something was wrong with the company, correct, because it wasn't hitting .40 a share?

MR. FUTTERMAN: At what time are you talking about?

Q. Isn't it a fact that when the stock came down to about two to $3 a share you were concerned not only about the price of the stock but about your investment?

A. Yes, I became concerned.

Q. And, in fact—

A. If you're investing.

Q. And, in fact, you began to question whether or not the information provided in the prospectus was accurate?

MR. FUTTERMAN: Object to the form of the question. There's no testimony to that effect.

A. No. I was just concerned about the stock at its price. I didn't think about the other things at that time. I was just concerned about the stock.

Q. And didn't you, in fact, question yourself, not to someone else, didn't you question to yourself, by the late spring of 1994, whether the information in the prospectus was accurate in light of the fact that the stock price went from 5.50 a share down to $2 a share?

A. I probably began to think that in my mind.

(Cutler dep., April 29, 1999, pp. 65–68)

Q. When is it that you first believed, to use the term you used two weeks ago,

that you had been jipped in this investment in Jasmine?

A. Well, jipped probably as the stock was going down.

Q. Which was in 1994 or '95?

A. '95.

Q. '95?

A. Yeah.

Q. So at no time in 1994 did you come to the conclusion that you had been jipped or cheated in your investment in Jasmine?

A. Well, I didn't like the direction of the stock but seemed to be all right.

Q. Seemed to be all right?

A. It will come back.

Q. So you were satisfied, were you, in 1994 about the question of whether or not you had been defrauded or cheated in your investment in Jasmine?

MR. FUTTERMAN: Object to the form of the question.

A. Not defrauded in '94.

Q. All right. Well, at any time in 1994 did you begin to ask yourself the question whether or not you had been cheated in investing in Jasmine?

A. Well, you always ask yourself what seems to be going wrong here.

Q. All right. And did the question arise in your own mind in 1994 as to whether or not you had been cheated in being induced in some way to invest in Jasmine?

A. It may have arisen in my mind. Something like that always does go through your mind.

Q. And when was it in 1994 that that arose in your mind?

A. Probably in the late spring.

Q. Of 1994; is that right?

A. Yeah.

(Cutler dep., April 29, 1999, pp. 119–121)

Q. And the question was: Late in the spring of 1994? And the answer was: Right. When you gave that testimony, were you guessing about the date?

A. I was guessing.

Q. After thinking about it, do you still believe that the light came on in the spring of 1994?

A. No.

Q. When do you think that happened?

A. Following year.

Q. You testified that late in the summer of 1994, you told your son-in-law that it doesn't look good. Did you have any reason to suspect fraud at the time you told him that?

A. No, I didn't.

Q. If you had suspected fraud in December of 1994 in connection with your Jasmine investment, what would you have done?

A. Sold the stock.

Q. Did you have any reason to believe in the summer of 1994 that Jasmine stock couldn't come back?

A. No.

Q. At any time in 1994 did you have any facts that indicated to you that Jasmine had perpetrated a fraud in its IPO?

A. No.

Q. At any time in 1994 did you have any information that Arthur Andersen had failed to conduct its audit of Jasmine's September 30, 1993 numbers—

A. No.

Q. —with generally accepted auditing standards or generally accepted accounting principles?

A. No.

Q. If at any time in 1994 you had any information that Jasmine had reported phoney numbers in its prospectus, what would you have done?

A. Sold the stock.

Q. If at any time in 1994 you had any information that Arthur Andersen's 1993 audit or Fishbein's 1992 audit had not been conducted in accordance with the proper standards of their

profession, what would you have done?

A. Same thing, sell the stock.

Q. The record in this case shows that Jasmine stock last traded on NASDAQ at the end of March of 1995. Before Jasmine stopped trading in 1995, did you have any information that led you to believe that Jasmine had perpetrated a fraud in connection with the IPO?

A. No.

Q. Before the stock stopped trading in March 1995, did you have any information that led you to believe that Arthur Andersen's audit of the 1993 financial statements of Jasmine had not complied with generally accepted accounting principles or generally accepted auditing standards?

A. No, I didn't.

Q. During any conversation that you had with Sands' employees in 1994, did anyone from Sands ever tell you that Jasmine reported phoney figures for the year ending September 30, 1993?

A. No, they didn't.

Q. If somebody at Sands had done that, what would you have done?

A. Sell the stock.

Q. At any time in 1994 did you think Jasmine, to use your vernacular, was going in the can?

A. I didn't think so.

Q. If you had, what would you have done?

Q. I would have sold the stock.

Q. Do you recall if you formed your belief that the rapid decline in the stock meant the prospectus was not correct before or after the date on which you made that notation, No market for the stock?

A. It would have been after.

Q. Did anyone or anything warn you of any risk before you made your investment in Jasmine that its financial statements, as reflected in the prospectus, might be fraudulent?

A. No.

Q. Were you willing to make an investment in the stock—would you have been willing to make an investment in the stock if you knew the financial statements were fraudulent?

A. I wouldn't.

Q. Did anyone or anything warn you prior to your investment in Jasmine stock that Arthur Andersen's 1993 audit might be contrary to generally accepted auditing standards or generally accepted accounting principles?

A. No.

Q. And, in fact, when it was down to $2 a share, forget about the year, when it was down to $2 a share the light went on, didn't it?

A. Came very concerned.

Q. Very concerned. And in fact, you thought when it was about $2 a share that you were being cheated?

A. In a way.

Q. Okay. And in a way that you thought that there was something going on that was not right here because you but it at 5.50 and six months later it's down to a dollar and-a-half,$2 a share, correct?

A. I just thought it wasn't performing, and calls to Sands Brothers they said that it's all right, they're just, I think their earnings were not going to meet expectations, that's why, but everything was all right.

Q. Right. All I want to know is that: In your own mind, by about June or July 1994, you had great concerns, did you not, that what was represented to you in December about the, in the prospectus about the financials and the wherewithal of Jasmine wasn't actually truthful?

A. No.

Q. You didn't have that concern in July?

A. No, no.

Q. Okay.

A. Just that the stock was not performing. I didn't think—

Q. And, well, didn't you call Sands Brothers and say to Sands, say to Mr. Bonaventura at Sands Brothers, Something's wrong with the stock?

A. No. I asked them what's wrong.

Q. And they said—then they gave you a typical salesman's response?

A. Right.

Q. But, in fact, instead of asking them, didn't you say, Something's got to be wrong with this stock?

A. No.

Q. You never said that?

A. No.... I thought it was going to come back.... You know, you keep emphasizing this light went on. You look at the price, you see it's going down, you say, well, it's not doing well but it should be all right, especially when I got encouragement from Sands Brothers.

Q. So all through 1995, then, there was no concern that the prospectus wasn't as stated?

A. Through 1995?

Q. Sure.

A. No.

Q. So in 1995 sometime you became concerned that the prospectus wasn't as stated?

A. Not about the prospectus, no. I didn't know what was going on.

Q. In 1995, did you become concerned that the financials of Jasmine weren't as stated in the prospectus?

A. The only time I became concerned is when it stopped trading.

Q. Is it your testimony now that not until the stock stopped trading was that when you became concerned about the financials that were in the prospectus?

A. When it stopped trading I became concerned about the whole thing, yes.

Q. Because you lost your money?

A. Yes.

Q. And did you ever try to sell the stock from the date you bought it up to the date it stopped trading?

A. No.

Q. And specifically, sir, did you consider or think about at all during these last two weeks the question of whether your testimony on April 14 as to 1994 being the time when you came to the conclusion that you had been cheated in the Jasmine investment would help or hurt your position in this lawsuit with regard to the statute of limitations?

A. I didn't think about cheated. I said jipped in the reference that I had made a bad investment, but cheated has a different meaning to me.

(Cutler dep., April 29, 1999, pp. 61–187). Bonaventura's deposition testimony follows:

Q. Did there ever come a time, sir, when you began to question the integrity of Jasmine management?

MR. FEENEY: Object to form.

A. Well, any time a stock goes down significantly, you question whether or not there is a problem at the company regardless of what the stock is.

Q. When did that time come for you?

A. When I started questioning whether or not this was—there was a problem with the company?

Q. Yes.

A. Oh, probably when the stock was roughly—I don't know if it is necessarily the price of the stock, but roughly, $3, 2–1/2, $3, $4.

Q. Did you tell your clients you were questioning management's integrity at that time?

A. I wasn't questioning management's integrity. I said I believe there possibly was a problem at the company.

Normally, the stock price dictates what is going on in the company.

Q. Did you tell your clients there might be a problem at the company?

A. I—I was trying to obtain any information I possibly could which would give me an explanation as to why the stock price was going down.

Q. From whom were you trying to obtain information.

A. We would call the company all the time. In fact, I personally spoke to Irv Mangel myself. I even went to one of their trade shows.

Q. What information did you obtain about why the stock was going down?

A. Nothing, really.

Q. What did you tell your clients the price of the stock was going down?

A. I explained to them we were doing all we possibly can to find out what is going on at the company, stock going down, possibly people getting bored with the stock, moving out of the stock, moving on to the next one. We certainly never recommended selling the stock because we had no reason to do that. We had, you know, tried to do everything we possibly could to obtain information on Jasmine, and we told people just to sit tight.

Q. So that was your advice to clients?

A. Not to see?

Q. Right.

A. We did not recommend to sell, no.

Q. And that's what you told Bernie Cutler?

A. I told Bernie Cutler, who called many times, and after a while I said to him "Bernie, if you're not satisfied with the information that I've given you, why don't you call the people you know over at Jasmine to find out information as well," which he did many time as well, he told me.

Q. Did there ever come a time when you questioned the integrity of Jasmine's management?

MR. FEENEY: Objection to form.

A. Well, when companies don't meet their business plan, you obviously are not happy with the situation. They forecasted numbers, and eventually didn't meet those numbers, and that's when the stock eventually went to zero.

Q. Did there come a time when you questioned the integrity of Jasmine management?

MR. FEENEY: Object to form.

A. When the stock was at zero, I certainly questioned the integrity of management.

(Bonaventura dep., 7/9/99, pp. 56–61)

A. I've seen companies report bad earnings before. Doesn't necessarily mean the company is going out of business. All various factors companies—

Q. Companies run into difficulties and things happen and they suffer losses?

A. In this particular instance, I think a lot of it at that point was blamed on the weather.

Q. So the publication of that 10–Q was no particular warning sign of any kind that there was something drastically wrong with the company, was it?

MS. TEMPLE: Objection.

MR. FEENEY: Objection to form.

A. It wasn't a good sign.

Q. It didn't tell you a fraud had been perpetrated, did it?

MS. TEMPLE: Objection to form.

MR. ROTH: Objection.

A. I don't think you can derive fraud from that, but I'm sure people were questioning whether this company was going to rebound.

A. By the time we got to, let's say June, July, I mean we got to a certain point where we were no longer getting as many answers from management as we would have liked, so you know people obviously becoming very upset with the price of the stock. We didn't

have any answers to give them.... At that point we certainly began to question the integrity of the management.

Q. Are you changing your testimony?

A. Well, when you have no answers to give somebody, then you have to obviously say that, you know. I didn't give up on the stock certainly until the stock went to zero.

Q. You didn't start to recommend people selling the stock before it went to zero, did you?

A. No.

(Bonaventura dep., 7/9/99, pp. 67–73)

A. Did I tell my clients to get out of the stock as fast as possible? ... No, I didn't.

Q. At any point prior to the stock stopping—at anytime prior to the time when the stock stopped trading, did you ever suspect that there had been a fraud perpetrated by Jasmine management?

A. Again, I personally did not go to the extent of thinking that was fraud. I just thought it was mismanagement at some point not meeting projections.

Q. Mismanagement in your mind is not a fraud?

A. Mismanagement is not fraud, no, not in my opinion.

Q. Did there ever come a point when you believed that Jasmine management had perpetrated a fraud?

MS. TEMPLE: Not just suspected, but believed?

A. Did I suspect possibly a fraud in Jasmine's—

Q. Yes.

A. Yes I had suspicions. I don't know what the—

Q. What caused you to have that suspicion?

A. Stock went to zero and the company is no longer in existence.

(Bonaventura dep., 7/9/99, pp. 131–139)

Q. When Mr. Cutler called you, what did he say, "I'm upset with the price of the stock"?

MR. ROTH: Which time?

A. "I'm upset, I'm irate, there must be something wrong." He started saying there must be something wrong with the company, it is fraud, this and that, and I said, "I'll give you every piece of information I could give you, Mr. Cutler."

Q. When did he say it was fraud?

A. Obviously later on.

Q. When obviously?

A. I don't recall the exact time, he called so many times.

Q. What words did he use in connection with the use of the word "fraud"?

A. "There must be some type of fraud going on here with the stock being the way it is."

Q. What did you tell him?

A. "I'm not aware of any fraud."

Q. If you had been, you would have told him, wouldn't you?

A. I believe so, yes.

Q. You didn't suspect any fraud, did you?

A. As any [sic] mentioned earlier, I felt there was obviously something wrong with the company, with the stock the way it is.... As I told you before, sitting in this chair right now I would say there had to be some fraud because the company is out of business and the stock is at zero, but I don't know that for sure. I can only speculate on fraud. I have no idea.

Q. Let's make the record perfectly clear now. At no time prior to the stock ceasing its trading in March of '95 did you believe that a fraud had been perpetrated; is that correct?

A. No, I suspected or thought to myself that there might be a problem or

there might be fraud, but that would only be speculation, and I don't pass on speculative rumors to my clients, I deal in facts.

(Bonaventura dep., 7/9/99, pp. 186–190).

■ "In the context of the statute of limitations defense, where contrary inferences may reasonably be drawn from the facts which are material to when the cause of action accrued, defendants bear a heavy burden of showing that the claims are untimely as a matter of law." *Gruber v. Price Waterhouse*, 697 F.Supp. 859, 861 (E.D.Pa.1988), *aff'd* 911 F.2d 960 (3d Cir.1990)(citing *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 487 (3d Cir.1985); *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir.), *cert. denied*, 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984)). Cutler's Section 11 claim would be barred if he knew or should have known by the exercise of reasonable diligence of the untrue statements or omissions in the registration statement more than one year before Berger filed the Complaint in this action on November 17, 1995. *See Gruber*, 697 F.Supp. at 861. Similarly, the 10(b) claim would be barred if Cutler knew of the alleged fraud prior to November of 1994. As can be seen from a reading of the above testimony, although when taken in a vacuum there is testimony which could lead one to make a determination on the statute of limitations and whether there was notice, the entirety of the record indicates that genuine issues of material fact preclude summary judgment on this ground.

■ The Court does not find that Andersen has established, through the use of Cutler's deposition testimony, an absence of genuine issues of material fact regarding Cutler's having actual notice of his securities claims in the Spring of 1994. Further, the Court is not convinced as a matter of law that prior to November of 1994, plaintiff Cutler had sufficient infor-

mation of possible wrongdoing to "excite 'storm warnings' of culpable activity" to impose a duty of reasonable diligence which, if pursued, would have disclosed the alleged fraud.

■ In this case, Andersen has pointed to no rumors or vague charges of sufficient substance to arouse suspicion. The actual notice theory is based on the decline in stock price, which, as Cutler alluded to during his deposition, could have an innocuous cause, nothing to do with fraud. Thus, the alleged "storm warnings" cited by Andersen are not necessarily indicative of fraud or culpable conduct.[15] *Compare Gruber v. Price Waterhouse*, 911 F.2d 960 (3d Cir.1990) (Earlier than one year before the section 11 cause of action was filed, plaintiff was aware of the following reports of fraud by management of the subject company, which were held to have put him on inquiry notice: "after reporting knowledge of fraud by [the company] management to the bankruptcy trustee, outside counsel for [the company] withdrew from representation; the trustee was also informed that the FBI had found several of [the company]'s financial and accounting records in a city dump; the trustee was served with a state grand jury subpoena after a state investigation into [the company] was instituted; a federal investigation was similarly initiated; and investigators linked [the company's primary customer]'s sole shareholder and principal officer to organized crime.... [A] former financial officer of [the company] and an accountant both testified to occurrences of fraud by [the company] in connection with financial reporting.... [P]laintiffs began to receive documents from Price Waterhouse, including a "Management Letter" specifying deficiencies in [the company]'s accounting procedures.").

■ The Court realizes that "the time from which the statute of limitations be-

---

**15.** As one court has stated, "inquiry notice starts to run when 'a person of ordinary intelligence would have suspected that he or she was being defrauded.'" *Leach v. Quality Health Services, Inc.*, 902 F.Supp. 554, 557 (E.D.Pa.1995) (citations omitted).

gins to run is not the time at which a plaintiff becomes aware of all of the narrow aspects of the alleged fraud, but rather the time at which plaintiff should have discovered the general fraudulent scheme." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 975 F.Supp. 584, 599 (D.N.J.1996)(quotation omitted). Nonetheless, as this Court discussed in a prior Order, related to the drop in the price of stock,

> Jasmine did experience losses, and these economic conditions were reported in its 10–Q forms as early as February 14, 1994. However, throughout this period, Andersen, one of the "big six" accounting firms, did not adjust its position which approved of Jasmine's financial statements and economic viability. Additionally, the December 19, 1994 8–K form, while it revealed Andersen withdrew as Jasmine's accountant, did not reveal any discrepancies or irregularities in Jasmine's previous financial statements. Andersen's withdrawal was reported as a "mutual" parting, which does not necessarily infer any potential illicit conduct.

December 1, 1997 Order, pp. 15–18. Thus, the drop in the price of stock did not seem to excite storm warning as far as Andersen was concerned. The Fifth Circuit, in *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 969 (5th Cir.1981), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982), stated, in dicta, "[w]e can conceive of several factual situations in which a price decline, under the circumstances here, would not be indicative of fraud in the least, e.g., a depressed real estate market caused either by tight money or recession." *Id.* The cases cited by Andersen for the proposition that dramatic stock price declines can put investors on inquiry notice of potential securities claims may be distinguished because they each also involved misrepresentations relating to the value of

the stock and that the investments would produce a stable or stellar income with minimal risk. *See, e.g., Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 720 (7th Cir.1993), *cert. denied*, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994)(Where a stock which plaintiffs had been told a year earlier was greatly undervalued and would soon be worth twice as much and at worst would not fall by more than 10 percent had lost almost 90 percent of its value, an investor would have become suspicious and investigated when the company's "emphatic and precise prediction was so swiftly and dramatically falsified."). In such a case, it is conceivable that a sharp decline in the value of a security shortly after a representation that the security will produce a stable income without any risk "would in fact tend to indicate that the representation was false." *Summer*, 664 F.2d at 969 n. 2.

In this case, however, the decline in stock price alone which caused "concern" to Cutler is insufficient to have put him on inquiry notice prior to November of 1994. He did not have knowledge of facts sufficient to put a reasonable person on notice of the alleged fraud.[16] Moreover, reading the entirety of his testimony, the Court cannot hold, as a matter of law, that there are no genuine issues of material fact precluding a finding that Cutler was on actual notice of the securities claims in the Spring of 1994. In so holding, this Court is mindful of its duty to refrain from making credibility determinations on a motion for summary judgment.

3. *Motion as Against Berger's Claims*

i. Andersen argues that Berger's federal securities claims are time-barred.

Again, Andersen argues that Berger's federal claims are time-barred because his testimony confirms that he was put on inquiry notice by May of 1994 but did not contact counsel until September of 1995.

---

**16.** In addition, the price of the stock appeared to be rebounding for a short time just two

months prior, in September of 1994.

Andersen also argues that inquiry notice is established by Jasmine's quarterly reports and decline in stock price, Jasmine's December 31, 1993 Form 10–Q filed February 14, 1994 which disclosed a $1 million loss for the quarter ending two weeks after the IPO, Jasmine's March 31, 1994 10–Q filed May 11, 1994 which reported a $1.4 million loss for the previous six month period and the termination of McKowan Lowe as a source of income, and the fact that McKowan still owed $856,000 on the $915,000 it had given as part of an Option Sale.

Plaintiffs argue that these same arguments were raised in a motion to dismiss and were rejected by this Court. Further, plaintiffs argue that Andersen chopped up the deposition testimony it cites for support and that although Berger's testimony indicates his anxiety, it does not indicate that he suspected culpable activity or fraud.

Having reviewed the deposition testimony which is now part of the record, the Court does not find that Andersen has met its burden of establishing no genuine issue of material fact in the premise that Berger was on inquiry notice before November of 1994. As with Cutler, the testimony indicates Berger's anxiety with the performance of the stock, but not that he suspected culpable activity. For the additional reasons discussed in the denial of the motion to dismiss based on these grounds and in the above subsection relating to whether Cutler's federal claims are time-barred, the Court will deny summary judgment on the basis that Berger's claims are time-barred.

ii. Andersen argues that Berger's section 10(b) claim, as well as his claims for negligent misrepresentation and common law fraud, must fail because Berger did not rely on Andersen's 1993 Audit Report.

The second argument raised by Anderson in support of its motion on plaintiff Berger's claims is that Berger cannot demonstrate the requisite causation under Rule 10b–5 because his decision to purchase the Jasmine stock was based "solely on the oral representations of his broker ... and without even seeing the Prospectus beforehand." In response, Berger argues that he indirectly relied on the 1993 audit report and Prospectus because his broker relied on them when he recommended the Jasmine stock. Moreover, he argues that he is entitled to a presumption of reliance under a "fraud on the market" or "fraud created the market" theory.

Where a 10b–5 action is premised on an alleged misrepresentation, the plaintiff must demonstrate that the defendant's misrepresentation caused him to purchase stock and incur damages. *See* Rule 10b–5. *But see Semerenko v. Cendant Corp.*, 216 F.3d 315, 2000 WL 772933, * 10 (3d Cir. June 16, 2000) (noting that presumption of reliance is recognized in certain cases). In order to establish such reliance, it is not necessary for a plaintiff to show that he personally read the allegedly misleading materials. Derivative reliance is sufficient. *See VT Investors v. R & D Funding Corp.*, 733 F.Supp. 823, 834 (D.N.J.1990) (noting that 10b–5 does not require direct contact between plaintiff and defendant). *See also Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir.1995), *cert. denied*, 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996)(finding reliance where plaintiffs relied upon report which contained conclusions that were predicated upon allegedly misleading materials); *Austin v. Loftsgaarden*, 675 F.2d 168, 177–78 & n. 19 (8th Cir.1982), *rev'd on other grounds sub nom. Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (finding derivative reliance where plaintiff relied upon third parties who testified that they relied upon deceptive materials).

In this case, it is undisputed that Berger relied upon the representations of his Sands broker, Steven Franklin, when he purchased the Jasmine stock. Berger

Dep. at 31. Anderson argues, however, that Berger has failed to demonstrate that Mr. Franklin in turn relied upon the Prospectus or 1993 audit report when he recommended the Jasmine stock.

The only evidence in the record as to what information Mr. Franklin based his recommendations comes from Berger's deposition. During his deposition, Berger describes how Mr. Franklin "strongly urged" him to buy the Jasmine stock. Specifically, Mr. Franklin allegedly told him that "an I.P.O. [was] coming out" and "he mentioned Jasmine and he mentioned to me that this is a very good I.P.O. I mean the company is doing extremely well, they're expanding sales. I mean, they're a—it's a very excellent firm. Their earnings are increasing, and he strongly urged me to buy that stock." Berger Dep. at 31. Berger subsequently explained that he relied on Mr. Franklin's recommendation because he "took for granted that they had thoroughly examined the claims made in the prospectus." Berger Dep. at 36.

From Mr. Franklin's purported statements that Jasmine "was expanding sales" and "its earnings are increasing," a reasonable jury could infer that Mr. Franklin was relying on the "fraudulently inflated" sales and earnings reported in the Prospectus when he recommended the Jasmine stock to Mr. Berger. Therefore, the Court will deny summary judgment on this ground and need not address plaintiff's theories of "fraud on the market" or "fraud created the market" or resolve the nature of the 10b–5 violations.

iii. Andersen argues that Berger's section 11 claim must fail because Berger did not buy in the IPO.

Section 11 provides:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security . . .

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of

the reading of the registration statement by such person.

15 U.S.C. § 77k(a).

In *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), the Third Circuit held that § 11 and § 12(2) of the 1933 Securities Act apply only to stocks bought in an initial public offering and not to stocks purchased through secondary market transactions. Further, the Supreme Court in *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), referring to the *Ballay* case asserted that the word "prospectus" in § 12(2) precludes liability under this section for anything other than a stock purchase on an initial offering.

 The Third Circuit has noted that if a plaintiff's "shares were purchased in the secondary market, they would not be linked to a registration statement filed during the class period, and the § 11 claim would fail." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 286 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Thus, purchasers on the open or secondary market have no cause of action under section 11 because, by definition, their purchases were not made pursuant to an initial public offering. *Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 575 (D.N.J.1996). *See also Brosious v. Children's Place Retail Stores,* 189 F.R.D. 138, 143–44 (D.N.J.1999)(concluding that legislative history supports theory that secondary market purchasers do not have standing under § 11 because Congress has not required the distribution of the registration statement for a period after an IPO as a necessary safeguard of secondary market transactions).

Jasmine conducted its initial public offering on December 15, 1993 when its registration statement became effective. Sands Brothers was to sell 1,666,667 shares of Jasmine stock to the public at $5.50 per share.[17] In addition, Jasmine granted Sands Brothers an option, exercisable within 30 days, to purchase up to 250,000 additional shares "on the same terms" to cover any over-allotments. The IPO closed on December 22, 1993. On January 7, 1994, Sands Brothers exercised its over-allotment option for 250,000 shares.

Plaintiff Harry Berger purchased 2,700 shares of Jasmine stock from Sands Brothers on January 11, 1994 at a price of $ 6 ⅞ per share with a markup of 1/8. Andersen has produced an expert affidavit from the former Commissioner and Acting Chairman of the SEC who has interpreted this information to conclude that Berger did not buy in either the IPO or from the over-allotment of shares. Affidavit of Charles C. Cox, Exhibit 1 to Appendix, Part I attached to Andersen's motion. If Berger purchased in the IPO, his purchase would have been on December 15, 1993 [18], the date the registration statement became effective, and whether he purchased in the IPO or from the over-allotment, his purchase price would have been $5.50. The affidavit of Alan Bluestine. Managing Director of Sands Brothers, corroborates this [19]. Exhibit 2 to Appendix, Part I attached to Andersen's motion.

Berger argues that he can trace his shares to Jasmine's registration statement, as can all shareholders because Jasmine could only issue shares to the public pursuant to the registration statement, thus the only shares that the public could have traded were those issued pursuant to that registration statement. This argument

---

**17.** Secondary market trading in Jasmine stock began in the Nasdaq market December 16, 1993.

**18.** If he purchased from the over-allotment, according to Cox, his shares would have been committed to him on or about December 15,

1993, despite the fact that Sands Brothers did not exercise its option until January 7, 1994.

**19.** This affidavit also states that Sands Brothers just so happened to have been the market maker for plaintiff's transaction.

has been rejected within this circuit, however. *See Warden v. Crown Am. Realty Trust,* 1998 WL 725946, *3 n. 2 (W.D.Pa.1998)(argument "effectively guts *Ballay*'s cabining of § 11 to initial offerings and gives that section essentially the same reach as the Exchange Act, but without its scienter requirement.") This Court also is not persuaded by Berger's tracing argument, but rather is convinced by the rationale of *Brosious,* 189 F.R.D. at 143–44, which is based in large part on legislative history combined with the recent decisions of the Supreme Court and the Third Circuit, that Berger must have purchased in the IPO in order to be able to recover on his section 11 claim. The Third Circuit also has used legislative history to construe the meaning of the 1933 Act:

> Congress' intent in enacting the 1933 Act was clearly to regulate initial offerings. In the House Report accompanying the 1933 Act, the legislators specifically stated: '[t]he bill affects only new offerings of securities sold through the use of the mails or of instrumentalities of interstate or foreign transportation or communication. It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering.'

*Ballay,* 925 F.2d at 690 (quoting H.R. No. 85, 73d Cong., Sess. 7(1933)). Though the *Ballay* court ostensibly considered a different section of the 1933 Act, it is its interpretation of the 1933 Act in its entirety that is consequential and which leads this Court to rely on the *Brosious* opinion.

Berger has filed a motion for leave to file a surreply to Andersen's motion for summary judgment in order to present additional evidence that Berger did purchase his Jasmine stock in the IPO. Berger has produced "trade runs" from Morgan Stanley, Sands' clearing broker, covering the period December 15, 1993 through January 10, 1994 which supposedly reflect every sale of Jasmine stock during this period. These trade runs, according to Berger, show that only 1,910,167 Jasmine shares sold at $5.50 prior to December 22, 1993, leaving 6500 shares of IPO-issued stock unaccounted for, and possibly bought by Berger and others shortly after January 7, 1994.

At the outset, the Court notes that these "trade runs" are unauthenticated.[20] Nonetheless, plaintiff Berger will be granted leave to file his surreply, but the Court finds it insufficient, in light of the evidence provided by defendants pursuant to Rule 56(e), to create a genuine issue of material fact regarding whether he purchased in the IPO. The Court finds that Berger did not purchase his shares of Jasmine stock in the IPO or over-allotment, and so summary judgment will be granted on his section 11 claim.

iv. Andersen argues that Berger's state law based claims must fail because Berger has not established causation.

Finally, Andersen summarily argues that Berger's state law claims under the Illinois Consumer Fraud Act, negligent misrepresentation, and common law fraud

---

**20.** On the other hand, in response to Berger's motion, the defendants have provided the Court with a declaration under penalty of perjury from counsel to Morgan Stanley attaching computer generated documents which were also provided to plaintiffs in response to a subpoena. These documents indicate that Bernard Cutler purchased Jasmine stock and was coded as a "46" in the MKT OPT column of the trade runs and Harry Berger purchased Jasmine stock and was coded as a "45". Morgan Stanley's counsel indicates that she was informed by the appropriate employees of Morgan Stanley that "46" reflects trades booked to the "Syndicate Retail Blotter", which means they were purchases or sales in connection with an initial public offering. Sales coded as "45" reflected "OTC Cross Net as Principal Blotter" which was indicated to mean that these were secondary market or non-IPO trades executed over the counter. Morgan Stanley informed plaintiffs' attorneys of this information when the trade runs were produced.

each require plaintiff to establish the element of causation, which he cannot do because he bought Jasmine stock based solely on his conversation with a Sands broker and never saw the Prospectus, which contained Andersen's audit report, before purchasing the stock. Thus, Andersen's report had no causal effect on Berger's investment in Jasmine stock.

For the same reasons discussed under the section of this Opinion dealing with whether Berger can prove reliance, this Court will deny summary judgment on these claims as precluded by genuine issues of material fact.

### B. *Cutler's Motion for Class Certification*

As outlined above, on February 2, 2000, plaintiff Cutler filed a motion for class certification on behalf of all purchasers of publicly-traded securities of Jasmine, Ltd. who purchased during the period from December 15, 1993 through and including June 20, 1995. In this newest motion, Cutler asks this Court to certify a class for those claims which were not before the Court in the motion for preliminary approval of the Fishbein settlement and where reliance is not an element. Thus, Cutler seeks certification of his claims under Sections 11 and 12(2) of the Securities Act of 1933, arguing that any relationships he may have had with Jasmine insiders are irrelevant to these claims which do not require a showing of reliance.

#### 1. *Arguments by the Parties For and Against Certification*

In arguing that Cutler's claims are typical of the class, his attorneys point out that Cutler purchased his shares from Sands Brothers in the IPO after he read the prospectus. According to Cutler, in order to recover on a Section 11 claim, he and the class must show only that (1) they purchased securities traceable to an effective registration statement; (2) defendants fall within the statutory categories of persons who may be sued; and (3) the registration statement contained a material misstatement or omission. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 923 (D.N.J.1998).

Next, Cutler argues that he is an adequate class representative and that his counsel are highly experienced and competent in the area of securities class actions.

Finally, Cutler seeks certification under Rule 23(b)(3), arguing that common questions predominate and a class action is the superior method of adjudicating this suit.

Andersen and Sands Brothers filed briefs in opposition to the class certification motion. Andersen argues that this Court already has determined that Cutler cannot represent the class with respect to the common law fraud and negligent misrepresentation claims because his access to non-public information about Jasmine subjects him to the unique defense of non-reliance on the alleged misrepresentations contained in the Prospectus. Andersen points out that the same reasoning of "insider" access applies to Cutler's claim under Section 10(b) of the Securities and Exchange Act of 1934. Andersen argues that Cutler's representation of a Sections 11 and 12 class, while simultaneously maintaining his additional individual claims, would create a conflict of interest because the putative class members will remain unrepresented with regard to three of their potential claims, which Cutler will be free to pursue without sharing in the proceeds. Andersen also argues that conflicts of interest render · Cutler's counsel inadequate because Berger and Cutler have individual claims which may benefit them more than the class claims, and that counsel is inadequate for failure to adequately investigate the putative class representative so as to discover the alleged "insider" status and for failure to bring a Section 11 claim against Fishbein within the requisite limitations period.

Finally, Andersen contends that Cutler's federal securities claims are time-barred because he was on notice of them no later than the Spring of 1994. Andersen cites to Cutler's deposition testimony in arguing that Cutler had subjective knowledge of his potential securities fraud claims by late Spring of 1994, over one year prior to the filing of either his motion to intervene or Berger's lawsuit. Andersen contends that the sworn testimony of Robert Bonaventura, a senior managing director of Sands who helped Cutler with his purchase of Jasmine stock, confirms that Cutler believed in the Spring of 1994 that he had been defrauded.

Sands Brothers also opposes granting class certification on the same grounds as Andersen, arguing that the statute of limitations defense applicable to Cutler's claims renders them atypical, and stating "Cutler's abandonment of the remaining claims is a complete breach and abdication of his responsibilities to the class and, indeed, represents a conflict of interest with the class." Sands Brothers Brief in Opposition to Certification Motion, p. 2. Moreover, the Sands defendants state, "Cutler's counsel is inadequate because of its mishandling of this case and allowing this case to proceed for five years without an adequate class representative and no prospects of obtaining an adequate class representative." *Id.*

In reply, Cutler argues that the defendants have not identified an aspect of his individual fraud claim which is antagonistic to the class fraud claims; thus, argues Cutler, there is no conflict. He cites *Lazy Oil v. Witco Corp.*, 166 F.3d 581, 589 (3d Cir.), *cert. denied*, 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999)("the conflict rules do not appear to be drafted with class action procedures in mind and may be at odds with the policies underlying class action rules") and *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 393–96 (D.N.J.1998) (rejecting theoretical conflicts). He argues that, in any event, the value of the class' cumulative Section 11 and 12 claims is much higher than the value of all of Cutler's individual claims which are based on his $5,000 out-of-pocket loss. Further, Cutler argues that courts within this district have held that class certification may be granted as to some but not all of a named plaintiff's claims. *See, e.g., Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544–45 (D.N.J.1999)(court rejected argument that named plaintiff was not typical because she asserted a claim under state law in addition to those she asserted on behalf of the class). *See also Grasty v. Amalgamated Clothing and Textile Workers Union, AFL–CIO*, 828 F.2d 123, 130 (3d Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988)(named plaintiffs were typical although they did not share all of the class claims); *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 791 (N.D.Ill.1984)(named plaintiff could not represent 10(b)(5) class because she was subject to nonreliance defense but could adequately represent Section 11 and 12 class).

Finally, Cutler argues that the statute of limitations is not properly at issue on this motion to certify because it goes to the merits of the case and need not be addressed at the certification stage. Nonetheless, Cutler argues, defendants have failed to meet their "heavy burden" of establishing inquiry notice (citing *Gruber v. Price Waterhouse*, 697 F.Supp. 859, 861 (E.D.Pa.1988), *aff'd* 911 F.2d 960 (3d Cir. 1990)). *See In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 941 (D.N.J.1998)("The facts constituting [inquiry] notice must be sufficiently probative of fraud—sufficiently advanced beyond the state of mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit.").

### 2. *Prerequisites to Class Action Certification*

Rule 23(a) of the Federal Rules of Civil Procedure stipulates four

prerequisites before a class action suit may be brought. It states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see also Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65 (D.N.J.1993). A potential plaintiff must indicate: (1) the numerosity of the lawsuit; (2) the commonality of plaintiff's and prospective class' claim; (3) the typicality of plaintiff's and prospective class' interests; and (4) the adequacy of representation of both the plaintiff and the plaintiff's lawyers of the class. *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 624 (3d Cir.1996), *aff'd* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). A reviewing court is not to consider the merits of the case when making a determination regarding these four elements. *See Liberty Lincoln Mercury, Inc.*, 149 F.R.D. at 73; *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 139 (D.N.J.1984). "In addition to the requirements expressly enumerated in Rule 23, class actions are also subject to more generally applicable rules such as those governing standing and mootness." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir.2000). Significantly, "[t]he Third Circuit has held that 'the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing the class action.'" *In re Data Access*, 103 F.R.D. at 137 (quoting *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970)(quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969))).

### 3. *Necessity of Analysis*

In light of the above ruling on Andersen's summary judgment motion, it would be a futile exercise to evaluate these prerequisites. Despite the fact that a reviewing court is not to consider the merits of the case when making a determination regarding these four elements, the above grant of summary judgment on the claims which plaintiff asks to be certified renders the motion for class certification moot.

The Court notes that this is not a case where the class representative had a live claim at the time. he moved for class certification, so the Court should not dismiss the pending motion just because the individual claim has become moot. *See Holmes*, at 136. Rather, the discussion above renders the class claim non-viable, while the individual claim remained intact. Because the Court determined above that the class claims asserting federal securities causes of action are barred by the applicable one year statutes of limitation[21], and because these are the only claims which the instant motion argues should be certified[22], the motion will be dismissed as moot.

---

**21.** The Section 12 claim also carries a one-year statute of limitations, *Insurance Consultants of America, Inc. v. Southeastern Insurance Group, Inc.*, 746 F.Supp. 390, 404 (D.N.J.1990), so the analysis of the Section 11 and the Section 10(b) claims in summary judgment motion is equally applicable to it.

**22.** In a footnote, the plaintiff requests that this Court make a ruling on class certification "on all claims except those at issue in this Court's September 23, 1999 decision related to the Fishbein settlement. In support of the claims not specifically addressed herein, Cutler incorporates by reference the arguments set forth in Cutler's Motion for Class Certification and for Preliminary Approval of Settlement Agreement With Defendant Fishbein & Co. While disagreeing with the Court's analysis in that 9/23/99 decision, Cutler recognizes that the Court's analysis as to Cutler in that order would preclude class certification on all but Cutler's Section 11 and 12 claims." The Court sees this motion as requesting class

### III. *CONCLUSION*

For the foregoing reasons, defendant Arthur Andersen's motion for summary judgment will be granted in part and denied in part in that (a) summary judgment will be granted on plaintiff Cutler's federal securities class claims but (b) will be denied on plaintiff Cutler's individual federal securities claims; (c) summary judgment will be denied on plaintiff Berger's claims based on the arguments of statute of limitations, reliance, and causation, but (d) summary judgment will be granted on plaintiff Berger's section 11 claim because the Court finds he did not purchase his Jasmine shares in the IPO.

Plaintiff Harry Berger's motion for leave to file a surreply will be granted.

Plaintiffs' motion for class certification will be dismissed as moot.

An appropriate Order will enter.

### ORDER

This matter having come before the court (1) on defendant Arthur Andersen LLP's motion for summary judgment on plaintiffs' claims against it brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and on plaintiff Harry Berger's state law claims, and (2) on plaintiff Harry Berger's motion to file a surreply in opposition to the summary judgment motion, and (3) on plaintiffs' motion to certify a class;

For the reasons expressed in this Court's accompanying Opinion,

IT IS ORDERED on this 30th day of June, 2000, that defendant Arthur Andersen's motion for summary judgment [259] is hereby GRANTED IN PART and DENIED IN PART;

IT IS FURTHER ORDERED that plaintiff Harry Berger's motion for leave to file a surreply is hereby [275] GRANTED;

IT IS FURTHER ORDERED that plaintiffs' motion for class certification [276] is hereby DISMISSED AS MOOT.

certification on the Section 11 and 12 claims, as that is what was argued in the opening brief.